HILLS STORES COMPANY,
et al., Plaintiffs,

v.

Michael BOZIC, et al., Defendants.

Gayle Dolowich, et al., Plaintiffs,

v.

Chaim Y. Edelstein, et al., Defendants.

Peter M. Fusco, et al., Plaintiffs,

v.

Chaim Y. Edelstein, et al., Defendants.

Civil Actions Nos. 14527,
14460, and 14787.

Court of Chancery of Delaware,
New Castle County.

Submitted: Feb. 9, 2000.

Decided: Feb. 22, 2000.

David C. McBride, Esquire and Martin S. Lessner, Esquire of Young Conaway Stargatt & Taylor, Wilmington, DE, of Counsel: Alan R. Friedman, Esquire, Jonathon M. Wagner, Esquire, and Elizabeth Wolstein, Esquire, of Kramer Levin Naftalis & Frankel, New York, NY, Attorneys for Plaintiffs in C.A. No. 14527.

Joseph A. Rosenthal, Esquire of Rosenthal, Monhait, Gross & Goddess, Wilmington, DE, for Plaintiffs in C.A. Nos. 14460 and 14787.

Kevin G. Abrams, Esquire, Raymond J. DiCamillo, Esquire, Thad J. Bracegirdle, Esquire, of Richards, Layton & Finger, Wilmington, DE, of Counsel: John D. Donovan, Jr., Esquire, Robert G. Jones, Esquire, Alexandra D. Furth, Esquire, of Ropes & Gray, Boston, for Defendants.

## OPINION

STRINE, Vice Chancellor.

In this case, the winning slate in a June 1995 proxy contest has caused the plaintiffs, the Hills Stores Company ("Hills") and its subsidiary Hills Department Stores Company ("HDS"), to sue the former members of the Hills board. The winning slate was proposed by Dickstein Partners, an investment fund that promised either to buy all of the shares of Hills for $22 in cash and $5 in junk bonds per share or to sell Hills to a higher bidder in the auction its slate pledged to conduct. Dickstein assured the Hills stockholders that it had the wherewithal to finance the acquisition and to cover the costs that would accompany a change in control of the Hills board.

Those costs included the payment of severance to certain top executives of Hills pursuant to employment agreements entered into the year before in response to a previous Dickstein-initiated control contest. Those agreements provided that the executives covered by the contracts would have the right to resign and receive full severance in the event of any change in control, other than one approved by the Hills board. In a judicial settlement, Hills and Dickstein both agreed not to challenge the validity of the employment agreements.

After Dickstein made its acquisition offer in the spring of 1995, the Hills board determined that the offer was inadequate

and shakily financed and that Dickstein's proposed strategy for the company was harmful. Rather than erecting substantial defensive measures, however, the Hills board decided to let the stockholders decide whether to accept the Dickstein offer for themselves in a board election contest at the Hills annual meeting.

The day before that meeting the Hills board met in response to Dickstein's demand that the board vote on whether to approve the Dickstein change in control solely for purposes of the employment agreements. After receiving advice from legal counsel, the members of the Hills board without an interest in that decision unanimously decided not to approve the Dickstein change in control. They, the undisputed evidence shows, believed that change in control to be a serious threat to Hills and that the company had promised the covered executives severance in such a situation.

After the Dickstein slate took office, the covered executives resigned and received their severance. The company's creditors terminated their debt agreements with Hills. Dickstein, however, apparently lacked the financing to deal with these known and foreseeable risks. Thus it never consummated its acquisition offer nor did it conduct an auction. Instead, its slate caused Hills to bring this suit against the former Hills board in September 1995 alleging that the payment of severance resulted from breaches of fiduciary duty and contract by the former Hills directors.[1] Nearly four years after Dickstein prevailed in its effort to secure control of the Hills board, the sale of Hills for $1.50 a share was consummated.

In this opinion, I find that the defendant-directors are entitled to summary judgment on the plaintiffs' breach of fiduciary duty claims. Because of the defensive origins and purpose of the employment agreements, I apply the *Unocal*[2] standard of review and conclude that the defendant-directors have submitted evidence sufficient to entitle them to summary judgment under that standard. The plaintiffs have produced no evidence to rebut the evidence that the defendant-directors' decision to oppose the Dickstein change in control was made on a well-informed and good faith basis. Nor have they submitted a convincing argument as to why the defendant-directors were unreasonable in concluding that the company had contractual duties to the covered executives that required the payment of severance if the board could not, in good faith, approve a change in control as benign to the company and its stockholders.

But because the plaintiffs have produced unrebutted evidence that some of the covered executives received severance in excess of that required by their employment agreements, I also grant the plaintiffs' motion for partial summary judgment to recover those amounts.[3]

### I. *Factual Background*

### A. *The Genesis Of The Employment Agreements*

At all relevant times, Hills was a Delaware corporation engaged in the retail dis-

---

**1.** In this opinion, I refer to the former members of the Hills board who are defendants as defendants or defendant-directors.

**2.** *Unocal Corp. v. Mesa Petroleum Co.,* Del. Supr., 493 A.2d 946 (1985).

**3.** Two of the three civil actions affected by this opinion were initiated on behalf of a purported class of Hills stockholders. The class plaintiffs have joined in the papers filed by the Hills company plaintiffs and are not differently situated from them in any material respect. As such, this opinion will dispose of the class plaintiffs' claims as well.

count department store business. Its shares were traded on the New York Stock Exchange. Hills managed its 152 stores through its wholly-owned operating subsidiary, HDS.

In the fall of 1993, Hills emerged from bankruptcy under the managerial leadership of its Chief Executive Officer Michael Bozic, who is a defendant in this litigation, and a new board of directors. Aside from Bozic, that board consisted of defendants Thomas H. Lee, James L. Moody, Jr., Richard B. Loynd, Susan E. Engel, John G. Reen, and Norman S. Matthews, as well as Michael S. Gross.[4] Only three of the Hills board members were "inside" directors: Bozic was CEO, Reen was Chief Financial Officer, and Matthews was a full-time consultant and the company's chief merchant.

The relative placidity of the Hills board's post-bankruptcy life was soon disturbed, however, by the unwanted attentions of Mark Dickstein and Dickstein Partners Inc. (collectively "Dickstein"). Dickstein had acquired 12% or so of Hills's stock in exchange for claims in bankruptcy it purchased during Hills's reorganization.

In August 1994—less than a year after Hills emerged from bankruptcy—Dickstein wanted Hills to repurchase six million of its shares for $150 million by using leveraged financing. To increase the persuasive impact of its suggestion, Dickstein initiated a consent solicitation to remove four members of the Hills board and replace them with its own nominees who were pledged to support the stock buy-back.

After retaining outside advice from the law firm of Cravath, Swaine & Moore and the investment bank of SmithBarney, the Hills board decided to oppose the Dickstein initiative as adverse to the company's best interests. In particular, the board believed that it was unwise to take on such substantial debt so soon after emerging from bankruptcy and that it was preferable to stick with management's existing game plan. As the Chairman of the Board, defendant Lee, put it, "[Dickstein] was perceived as a raider .... We, who had just emerged from bankruptcy, didn't want anything to do with weakening our balance sheet. We saw Dickstein as wanting to weaken our balance sheet by paying out a lot of cash to shareholders and possibly taking on a lot of debt." [5]

As part of its response to the Dickstein initiative, the Hills board decided to enter into new employment agreements with seven of Hills's top executives (the "Covered Executives") as well as a new consulting agreement with Matthews. The employment agreements were intended to provide the Covered Executives with enough security to allow them to focus on doing their jobs without distraction by Dickstein's overtures.[6]

The task of crafting the employment agreements fell in the first instance to the board's Compensation Committee, which was comprised of four outside directors. That Committee was aided in this endeavor by Barry White and David Feinberg from the law firm of Foley, Hoag & Eliot as well as Allen Finkelson from Cravath.

On August 19, 1994, the Hills board met to consider the Compensation Committee's recommendations. Critically for present purposes, the proposed employment agreements contained a provision entitling the

---

4. Gross left the board in January 1995.

5. Lee Dep. I at 23.

6. The plaintiffs have not contested the evidence that Bozic and his management team had other employment options. *See* Loynd Dep. at 20; Bozic Dep. at 53, 79.

Covered Executives to severance payments ("Severance") in certain circumstances. As the agreements were presented to the board by the Compensation Committee, the Covered Executives' right to Severance would have been triggered automatically in the event of a "Change in Control." A "Change in Control" was defined as occurring when any person became the beneficial owner of more than fifty percent of Hills's voting stock or elected more than thirty percent of the members of the Hills board as the result of an actual or threatened election contest.

After discussion, the board decided to adopted a different approach. That approach triggered the Covered Executive's right to Severance, in among other circumstances, when (i) the Covered Executive was demoted or fired within one year of any Change in Control or (ii) any Change in Control other than an "Approved Change in Control" occurred. An Approved Change in Control was defined as follows:

> [T]he term "Approved Change in Control" shall mean a Change of Control that has occurred with *the prior approval of a majority of the Continuing Directors* and the term "Continuing Director" shall mean any member of the Board of Directors of the Company who is not an Acquiring Person or a nominee or representative of an Acquiring Person or of any affiliate or associate of an Acquiring Person and any successor to a Continuing Director who was recommended for election or elected to succeed a Continuing Director by a majority of the Continuing Directors then on the Board of Directors of the Company.[7]

Two reasons motivated the board's decision to move away from an automatic vesting of Severance rights upon any Change in Control (a "single trigger" approach) to the more nuanced, or "double trigger" approach.

The primary reason was that the double trigger approach gave the Hills board the ability to "deliver management" to a friendly acquiror in a negotiated transaction.[8] The flip side of this ability was that the board could refuse to approve the Change in Control "if the prospective acquir[or] didn't seem to be offering sufficiently for the company ...."[9] That is, the Hills board could use the double trigger as negotiating leverage. If an acquiror agreed to the board's terms, the board could approve the Change in Control and allow the acquiror the opportunity to keep the Covered Executives or, at the very least, avoid the Severance. If an acquiror did not agree to the board's terms, the board could protect the expectations of the Covered Executives and deter the unwanted overture by failing to approve the Change in Control. This guaranteed the Covered Executives their Severance while increasing the potential acquiror's cost of acquisition.

The secondary reason the board opted for the double trigger approach was more narrowly confined to the dynamic it then confronted. At that time, Dickstein was seeking to replace half the board. The board feared that a single trigger might unsettle the company's creditors, who would be troubled by an automatic or, put more precisely, fully incentivized management exodus if Dickstein succeeded. The double trigger gave the creditors some reassurance that the Continuing Directors

7. PX 6 § 10(c).

8. Moody Dep. at 29–30; *see also* Loynd Dep. at 32.

9. Moody Dep. at 30.

would have the discretion to conclude that a Change in Control was acceptable and thereby avoid any automatic vesting of the Covered Executives' right to Severance.

Following the board's discussion of the Change in Control provisions, the three directors with an interest in the agreements (Bozic, Reen, and Matthews) stepped out of the meeting. The five remaining directors then unanimously voted to approve the employment contracts with the double trigger (the "Employment Agreements").

### B. *The Basic Components Of Severance Under The Employment Agreements*

Severance payable under the Agreements was an "amount equal to three (3X) times [the Covered] Executive's Annual Compensation ...." [10] The "Executive's Annual Compensation" was defined as the "sum of (A) the executive's base salary for 1994 plus (B) any bonus compensation to which [the Covered] Executive *would have been entitled* if [the Covered] Executive continued to be employed under [the] Agreement to the end of 1994 ...." [11] In addition, the Covered Executive was entitled to a gross-up payment for taxes owed pursuant to § 4999 of Title 26 of the United States Code. That statutory provision imposes an excise tax on severance payments that exceed a certain threshold.

### C. *The Hills Board Is Sued By Class Plaintiffs And Quickly Reaches A Settlement With Them And Dickstein*

Five days later, on August 24, 1994, a derivative and class action suit was filed in this court, captioned *Weiss v. Lee, et al .,* C.A. No. 13707 (the *"Weiss* Action"). The *Weiss* Action plaintiffs alleged, among other things, that the Hills board had breached its fiduciary duties by entering into the Employment Agreements.

By the next month, the Weiss plaintiffs, Dickstein, and Hills had reached a settlement involving the following basic provisions:

- Hills agreed to repurchase up to three million of its shares for $25 apiece.
- Hills agreed to revise the Employment Agreements, *inter alia,* to reduce their terms from three years to a somewhat shorter period and to agree that a Change in Control would not occur unless forty percent (rather than thirty percent) of the board was elected by an acquiror, if the board's size was increased from eight to nine or more.
- Dickstein agreed to drop its consent solicitation and support the removal from Hills' charter of the right of stockholders to act by consent.
- Dickstein agreed not to "institute, prosecute or pursue [any claim] against (or in the right of) [Hills] ... with respect to [the Employment Agreements]". [12]
- The *Weiss* Action class of plaintiffs—which consisted of all Hills stockholders on or after August 16, 1994, including Dickstein—agreed to compromise, release, and settle "[a]ll claims ... that arise now or hereafter out of ... the Employment Agreements...." These included all claims that had been or could have been brought by "Hills, the shareholders of Hills, or any member of the Class...." [13]

---

10. PX 6 § 10(c).

11. *Id.* (emphasis added). The Employment Agreements contained a somewhat different definition as of this time, but that difference is immaterial.

12. DX 6 § 2.2(a).

13. DX 4 ¶ 3.

With the agreement to settle, peace seemed on the horizon for Hills. The company was doing relatively well, with increased sales, earnings, and net income. As a result of this turnaround, a retailing industry publication named Hills's CEO Bozic as its "1994 Retailer of the Year." [14]

In January 1995, Hills completed the share buy-back it had agreed to accomplish. That same month, Hills adopted a Supplemental Executive Retirement Plan ("SERP") covering twenty top executives at Hills. Unlike the Employment Agreements, the SERP benefits vested automatically upon a Change in Control. A Change in Control was defined for purposes of the SERP in the same manner as in the Employment Agreements (as modified by the *Weiss* settlement).

### D. *The Weiss Action Settlement Is Approved*

On March 20, 1995, Chancellor Allen signed a final order resolving the *Weiss* Action on the basis of the September 1994 settlement terms. As contemplated, the final order released all claims that could have been brought in the Action arising out of the Employment Agreement—including by Hills itself—which was a party to the *Weiss* Action and bound by the judgment. [15]

### E. *Oops! The Employment Agreements Are With The Wrong Company!*

The Employment Agreements had one major technical flaw caught by none of the parties to the settlement or this court: the Agreements ran between the Covered Executives and HDS, Hills's subsidiary, and not between the Covered Executives and Hills. In one sense, this was understandable because HDS was the operating company and the Covered Executives did work for it.

But in the context of the Change in Control provision, the use of HDS made absolutely no sense. HDS was a wholly-owned subsidiary of Hills. Thus a Change in Control at HDS was not the threat the Change in Control provision was attempting to guard against. Rather, that provision was designed to protect the Covered Executives if a Change in Control at Hills occurred.

This was so obviously the intent of the Employment Agreements that the settlement agreement and final order in the *Weiss* Action each define those Agreements as being between Hills and the Covered Executives. [16] It appears undisputed that Hills, Dickstein, the *Weiss* plaintiffs, and this court believed that Hills was a party to the Employment Agreements and that the Change in Control provision applied at the Hills, not HDS, level.

### F. *Dickstein Puts Hills In Play Again*

Having settled one dispute with the Hills board, Dickstein promptly started another. On May 3, 1995, Dickstein sent Bozic a letter stating in part as follows:

We have been keenly observing your efforts to convince the investment community that by spending more than $70 million annually on capital expenditures, Hills will achieve increases in earnings per share that justify valuing Hills as a growth stock. Obviously, either the message has not been communicated or it has not been believed.

We seriously question the wisdom, in the existing retail environment, of spending the capital necessary to open twenty new stores a year, particularly when

---

14. DX 8.

15. DX 5 ¶ 7.

16. DX 4 ¶ D; DX 5 ¶ 7(b).

weighed against the alternative of repurchasing Hills' own stock in the marketplace at approximately three times EBITDA and when you have not yet gone up against Target Stores, who is likely to be Hills' toughest competition. Notwithstanding the above, we do believe that Hills' existing franchise is a strong one and as a result we are proposing to acquire, pursuant to a merger, all of Hills outstanding shares for $25 per share in cash.

\* \* \* \* \* \*

Dickstein Partners is willing to provide up to one half of the $75 million of equity capital we believe will be required to finance this transaction. We intend to expeditiously initiate discussions with third parties in order to raise the balance of the equity capital. Depending on the level of interest, we may be able to increase our proposal to materially higher than $25 per share.

\* \* \* \* \* \*

If we are successful in acquiring Hills, our preference would be to continue to employ existing management. However, we have prepared for the possibility of existing management leaving by retaining Chaim Edelstein, who we would intend to install as Hills' interim Chief Executive Officer while we search for a permanent management team. Mr. Edelstein was formerly chairman of Abraham & Strauss/Jordan Marsh, a division of Federated Department Stores. In case the Hills Board chooses to reject our acquisition proposal we are taking the precaution of nominating a slate of directors for election at Hills' upcoming annual meeting.... If elected, our nominees would, as soon as practicable, seek to have Jack Reen and yourself added to

the Board. Our nominees would seek to have Hills sold to the highest bidder. Subject to obtaining financing and other standard conditions we would be prepared to offer at least $25 per share in cash for Hills in such an auction.

NatWest Bank N.A. has also advised us that, subject to certain conditions, it is "highly confident" that it can arrange up to $335 million of new senior secured bank financing which may be required, together with Hills' available cash, to refinance those portions of Hills' existing debt (i.e., the working capital facility and the $160 million of public debt) which could accelerate upon the change of control that will occur if our nominees are elected to the Hills Board.[17]

G. *The Hills Board Rejects The Dickstein Proposal But Agrees To Let Its Stockholders Decide To Accept That Proposal At The Ballot Box*

The Hills board retained outside advisors to help them decide how to respond to the latest Dickstein overture (the "Dickstein Proposal" or "Dickstein Change in Control"). Cravath was again brought in to provide legal advice in addition to Foley, Hoag, as was the Delaware firm of Morris, Nichols, Arsht & Tunnell. The board retained SmithBarney to provide financial advice and D.F. King to act its proxy solicitor.

On May 15, 1995, the board met to consider the Dickstein Proposal. Cravath provided the board with an overview of its legal and contractual duties, including the Employment Agreements and other contracts—in particular the company's debt facilities—that had Change in Control triggers. SmithBarney presented its financial analysis of the Dickstein Proposal,[18] which

17. DX 11, at 1–2.

18. DX 12.

concluded that "the Dickstein Proposal was inadequate from a financial point of view." [19]

Management, through Bozic, presented its view of the Dickstein Proposal and its belief that the company's current strategy would deliver more value. Bozic also expressed management's view that it would prefer not to work at Hills under Dickstein's plan, because that plan would leave the company in a highly leveraged condition. Bozic did not, however, recommend aggressive defensive measures. Instead, he advised that the board "allow the stockholders to decide at the annual meeting whether to support the current Board and its policies for continued expansion or the Dickstein Proposal." [20]

Bozic, Reen, and Matthews were then excused from the meeting because of their interests in the Employment Agreements. At this point, the meeting minutes reflect that the following occurred:

Mr. Finkelson explained to the outside directors that under various employment and consulting contracts, each senior executive under contract would be paid three (3) times his 1994 salary and full bonus if Dickstein Partners was successful in replacing the current Board and the person resigned, but, if the Company was sold with Board approval, such payments would not be made.

The outside directors then reviewed the strategic alternatives that had been presented by Smith Barney, as well as management's recommendations, and expressed the view that the Dickstein Proposal was not in the best interest of shareholders. [21]

After the outside directors had reached their own determination that the Dickstein

Proposal should be rejected, the insiders returned to the meeting. The full board then voted unanimously to reject that Proposal. Several reasons existed for their decision:

- several low-end retailers were having a bad time of it and this was hurting the market valuation of all low-end retailers, making it an inopportune time to sell the company;
- the directors believed that the company's existing strategic plan—which involved expanding Hills and opening new stores—would deliver more value than $25 a share;
- at $25 a share, the total cost of Dickstein's offer was $642 million, yet only $75 million of that was to come from equity, the rest from debt;
- of the $75 million in equity, Dickstein could only commit to put up half and did not have a firm commitment for the other half; and
- Dickstein's debt financing was also questionable, and consisted of a conditioned "highly confident" letter from NatWest Bank, N.A. ("NatWest").

The same day, Bozic wrote Dickstein and told it that the board had rejected its proposal. [22]

On May 24, 1995, Dickstein revised its Proposal. The new Proposal offered Hills stockholders $22 per share in cash and $5 principal amount per share of new 14% payable-in-kind holding company debentures (a.k.a. "PIK" or "junk bonds"). Dickstein backed up this offer with a conditional "highly confident" letter from NatWest to finance the debt portion of the offer, but Dickstein still had found no one to supply the other half of the equity fi-

---

19. DX 14, at 3.

20. *Id.*, at 2.

21. *Id.*, at 3.

22. DX 15.

nancing required. Dickstein's letter stated that NatWest was "highly confident" that it could refinance Hills's existing debt, most of which would accelerate upon the election of the Dickstein slate.[23]

The Hills board met again on May 30, 1995 to consider the revised Dickstein Proposal. SmithBarney concluded that the revised Proposal had an implied valuation of $24.50 to $25.51 and was thus only questionably and marginally an increase over Dickstein's original Proposal. Smith-Barney also told the board that the Nat-West letter was subject to more than the typical conditions, that NatWest had never served as lead manager in a deal like the one Dickstein was proposing, and that Dickstein still had no commitment to the necessary level of equity financing.

The board decided to reject the revised Dickstein Proposal and to continue its efforts to secure reelection. Again, the board did not consider placing any defensive barriers in the path of Dickstein's proxy efforts.

On June 1, 1995, the Hills board mailed its proxy materials in connection with the company's June 23, 1995 annual meeting to its stockholders. Those materials explained the board's reasons for rejecting the Dickstein Proposal and for recommending against the election of the Dickstein slate. In particular, the board argued that the company's current strategy was sound, that it was a bad time to sell a low-end retailing company because such companies were trading at or near their twelvemonth lows, that the Dickstein leverage strategy was of the kind that had caused other retailers to descend into bankruptcy, and that Dickstein had not secured firm financing for its Proposal.

The board also disclosed the impact a Change in Control could have under the company's agreements with its creditors and under the Employment Agreements:

*Election of the Dickstein nominees would trigger a "change in control" under the Indenture covering Hills' 10.25% Senior Notes, the Credit Agreement governing the Company's $225 million working capital facility, the employment agreements of Hills' key senior executives and other significant arrangements to which Hills is a party.* Hills could be required immediately to repay—at a premium—approximately $160 million in principal of existing senior debt as well as any accrued but unpaid interest. The loss of the credit facility could adversely affect the terms under which Hills purchases inventory from vendors. The Dickstein Proposal also calls for replacing Hills' unsecured working capital facility with a secured facility—a change that management believes will harm relationships with vendors and reduce the amount of trade credit available to the Company, adversely affecting the Company's cash flow.

Election of the Dickstein nominees also would be extremely expensive for the Company. Such a change in control could require Hills to refinance its 10.25% Senior Notes and working capital credit facility. In addition, substantial payments could be required under certain sale-leaseback arrangements to which the Company is a party, under employment agreements with certain of the Company's senior executives, and under the Company's supplemental executive retirement plan. If the parties to the various arrangements described above exercise their rights upon a change in control, management estimates that a change in control could cost

23. DX 17.

Hills approximately $60 to $70 million. This estimate does not even consider many of the transaction costs involved in these refinancings and similar activities. Hills would incur these change in control costs even if the Dickstein nominees do not succeed in selling the Company. Merely electing Dickstein's nominees triggers a change in control.

Perhaps even more important than the financial burdens, if the Dickstein nominees are elected, the key senior executives who have been responsible for Hills' success will be able to terminate their employment and obtain substantial severance benefits. See "Employment Contracts" below. There is no assurance that Hills' senior management would remain with the Company upon such a change in control. The departure of those executives would be detrimental to the value of the Hills franchise....

 \* \* \* \* \* \*

In the event an executive terminates his employment agreement within one year after a Change in Control (other than an Approved Change in Control) such executive will receive a lump sum payment equal to (i) all earned but unpaid salary and pro rated bonus to the time of termination and (ii) three times such executive's 1994 base salary and bonus, subject to adjustment under certain circumstances; and such executive will continue to be entitled to benefits and perquisites during the stated term of the agreement.[24]

Dickstein's own proxy materials acknowledged the same potential effects and specifically noted that under the Employment Agreements the Covered Executives could "terminate their employment agreements [and receive their Severance] within one year following the occurrence of a Dickstein Change in Control without the approval of the existing Directors of Hills."[25] The approximate amount of the Covered Executives' Severance was easily calculable from the information on page twelve of the Dickstein materials.[26]

On June 5, 1995, Dickstein wrote a letter to Bozic, which it copied to all Hills stockholders, stating:

As you are probably aware, *in the event of a change of control that the existing Hills Board does not approve, then in fact there will be approximately $20 million of payments that must be made to members of management and one board member even if the beneficiaries continue to be employed by Hills.* However, if the existing Board approves of the change in control, then the severance payments are only made if the respective individual is no longer employed by Hills in a similar capacity. Obviously, in such a circumstance a prospective buyer for Hills can, all other things being equal, afford to pay a higher price for Hills. And, due to the fact that our stated preference is to continue to employ all of Hills' existing management, *if the existing Hills Board does not automatically trigger the $20 million golden parachute upon a change in control then we believe it probable that we can raise our existing offer.*

I also think that if the Hills Board does not approve of this change in control it would be ignoring its fiduciary obligations to shareholders by effectively transferring $20 million from sharehold-

---

24. DX 1 at 3, 17 (emphasis in original); *see also* PX 18 at 6–7 (disclosing same risks).

25. DX 13, at 12.

26. *Id.*

ers to management just when a sale of the company is about to occur.[27]

### H. *The Hills Board Takes Action To Ensure That The Employment Agreements Are Honored*

In the days leading up the June 23, 1995 annual meeting, the Hills board met on four occasions. During these meetings, the board took action to ensure that the Covered Executives would receive their Severance in the event of a Dickstein Change in Control.

Thus the board authorized the creation of so-called "Rabbi Trusts," into which funds sufficient to pay the Severance and other benefits due under the Employment Agreements, the SERP, and other relevant plans were deposited. The funds would then be payable by the trustee automatically upon the occurrence of events giving the Covered Executives the contractual right to payments. The board set these up in reliance upon the advice of Cravath, using funds from the company's revolving credit facility with Chemical Bank.[28]

The board also corrected the error in the original Employment Agreements which triggered a right to Severance in the event of an unapproved Change in Control at HDS, rather than at Hills. The board reasoned that the Employment Agree-

ments obviously contemplated that a Change in Control at Hills—not Hills's wholly-owned subsidiary which was not subject to a takeover except after a spin-off by its parent—would be the trigger for certain rights.[29]

### I. *Dickstein Urges The Board To Approve The Change in Control For Purposes Of The Employment Agreements Only*

On June 21, 1995, Dickstein's lawyer, David P. Levin of the firm of Kramer, Levin, Naftalis, Nessen, Kamin & Frankel, wrote to Hills's counsel at Cravath, Allen Finkelson. The letter speaks for itself:

[W]e begin with the incontrovertible proposition that whatever the existing Board does with respect to those golden parachute provisions must be in the best interests of Hills and its shareholders. It is equally incontrovertible that, under the present circumstances, it is *not in* the best interests of Hills or its shareholders for management to be entitled (upon termination) to parachute payments triggered merely by the shareholders *electing directors other than the incumbent board.* Thus, it is necessary for the incumbent board to take whatever action may avoid that possible liability, including approving the change of control that would result from the election of the Dickstein slate....

---

27. DX 20, at 1 (emphasis added).

28. The plaintiff alleges that the board somehow breached its fiduciary duties by failing to discuss with Chemical Bank the use of the facility for this purpose. Yet the plaintiff has failed to point to any contractual duty on the part of Hills to do so, nor has it dealt with the fact that the use of the facility to pay Severance and other employment benefits was *discussed* by Hills management with outside counsel, who agreed that such use was appropriate. In addition, it is difficult to imagine that Chemical Bank did not follow the proxy fight and realize that the Covered Executives' right to severance was likely to be triggered

given the board's opposition to the Dickstein Proposal. For these and other reasons, I conclude that this allegation is too insubstantial to sustain any relief and give it no further consideration.

29. Again, the plaintiffs challenge this action. This challenge is rather incredible given that Dickstein's own understanding and that of this Court was that the Employment Agreements ran between Hills and the Covered Executives. If ever there was a clear case of scrivener's error justifying reformation, this was it. I reject this challenge without further discussion.

[I]f the incumbent Board were to fail to approve the change of control (for whatever reason), that decision would be a self-interested one under Delaware law since it imposes upon the shareholders a penalty for *not* re-electing the incumbent Board. That decision would require the incumbent directors to prove that their inaction was "entirely fair" to Hills and its shareholders. Quite simply, it cannot be fair for the incumbent directors to cause a penalty to be imposed on the Hills' shareholders when there is action those directors could take under the golden parachute contracts to avoid that possible liability.[30]

The clear import of Levin's letter was that the Hills board was supposed to consider whether to approve the Change in Control for purposes of the Employment Agreements without consideration of the facts that: 1) the Covered Executives had stayed with the company throughout the turbulence of 1994 and 1995 in reliance upon their contractual protections; and 2) the board had already voted that the Change in Control was, in its view, harmful to the company and its stockholders. The simple analysis Levin believed was in order was whether, in the event that Dickstein won, it would be good or bad for the stockholders of Hills if the company were to trigger an immediate right on the part of the Covered Executives to resign and receive their Severance.

J. *The Board Meets To Consider Levin's Letter And To Vote On Whether To Approve The Dickstein Change in Control For Purposes Of The Employment Agreements*

Finkelson brought Levin's letter to the attention of the board the next day and according to his unrebutted affidavit gave the board the following advice:

> I advised the board that, in my opinion, concurred in by Johnston,[31] Levin's analysis was wrong. I advised the board that the obligation of the directors was to determine whether a Dickstein-led change in control of Hills was in the best interests of Hills stockholders. If they determined that it was not, the directors were under no obligation to "approve" such change in control for purposes of the employment agreements. I advised that, particularly in light of the history of the "approval" provision—an exception designed to allow Hills to retain management in the case of a transaction believed by the directors to be in the best interests of the stockholders of Hills—and in light of the directors['] belief that a Dickstein-led change in control was not in the best interests of the stockholders of Hills, a board decision not approving a potential Dickstein takeover for purposes of the employment agreements was justifiable.[32]

The board then discussed whether to approve the Change in Control for purposes of the Employment Agreement. By this time, the board knew that it was probable that Dickstein would win the election, but several members still harbored hope that a couple of the company's largest stockholders would decide to stick with the current board and thus tilt the outcome toward the incumbents.

In considering whether to approve the Change in Control for purposes of the Employment Agreements, it is evident that the board's view was that it was not appropriate to consider that question

---

**30.** DX 22, at 1 (emphasis in original).

**31.** This refers to Andrew M. Johnston of the Morris, Nichols firm.

**32.** Finkelson Aff. ¶ 19.

through the narrow prism recommended by Levin. Rather, the board followed the advice given it by Finkelson.

In doing so, the board was not unaware of the financial and operational consequences to the company of triggering the Covered Executives' right to resign and receive Severance, but the board did not give those factors much weight. Instead, the board believed that the company had made contracts with the Covered Executives, and that these contracts should be honored. As director Loynd put it, Hills faced "exactly the circumstances that had been anticipated going to contract, if you will more than a year earlier...." [33] Loynd continued, "I have always ... honored the commitments that I have made. And I expect my company to do the same." [34] The outside directors felt that the company had a contractual obligation to the Covered Executives to trigger their right to Severance, unless the board believed in good faith that the Change in Control was not harmful to the company.

In that regard, the board continued to adhere to its strongly held view that, for the reasons previously identified, the Dickstein Change in Control would be seriously adverse to the interests of the company and its stockholders. Therefore, the outside directors voted as a group to disapprove the Change in Control for purposes of the Employment Agreements. Then the full board voted the same way.

### K. *Dickstein Wins The Election But Doesn't Buy The Company Or Run An Auction*

On June 23, 1995, the Hills annual meeting took place. The Dickstein slate won election by a decisive margin. On July 5, 1995, the election results were certified. As both the board and Dickstein knew, this Change in Control had important consequences under the Employment Agreements, the SERP, the indenture agreement governing Hills's senior notes, and Hills's major credit agreement.

The same day the election results were certified, the Covered Executives all resigned. Upon resignation, they received the Severance, SERP, and other benefits due them under their various contracts and benefit plans.

Soon thereafter, Hills's primary creditor, Chemical Bank, exercised its default rights, forcing Dickstein to refinance the company's debt.[35] Despite the fact that Dickstein had assured Hills's stockholders it had the wherewithal to refinance the company's debt and bear the other costs associated with a Change in Control (including the Severance and SERP obligations) and to acquire all the shares of the company for $22 in cash plus $5 in PIK, Dickstein never did so. Nor did it run the promised auction. Instead, the Dickstein slate simply managed the company.

In April 1999, Hills was acquired from its stockholders by Ames Department Stores in exchange for $1.50 a share and a share in the upside of this lawsuit.

### II. *The Claims Of The Parties*

This matter is before me now on motions for summary judgment. The director-defendants have moved for sum-

---

**33.** Loynd Dep. at 94.

**34.** Loynd Dep. at 99.

**35.** Mark Dickstein and one of his slate attribute this to Chemical's outrage over the triggering of the Severance and the resignation of outgoing management. But no Chemical witness has said that is so, and Chemical had a contractual right to pull its financing upon a Change in Control, which Dickstein well knew.

mary judgment on the following claims made by the plaintiffs:

- that the defendant-directors breached their fiduciary duties by refusing to approve the Dickstein Change in Control for purposes of the Employment Agreements;
- that the defendant-directors committed waste by refusing to approve the Dickstein Change in Control for purposes of the Employment Agreements;
- that defendant-directors Bozic, Reen, and Matthews were unjustly enriched by the Severance they received under the Employment Agreements; and
- that defendant-directors Bozic, Reen, and Matthews received Severance and other payments in excess of what was due them under the Employment Agreement, SERP, and other relevant plans.

For their part, the plaintiffs have moved for partial summary judgment on their claim that the Covered Executives who are defendants—Bozic, Reen, and Matthews—received payments of Severance that exceeded the proper amount due them under the Employment Agreements.

In addressing these claims, I apply the familiar standard under Court of Chancery Court Rule 56. Under that standard, summary judgment should be granted where there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law.[36] When a moving party has properly supported its motion, the non-moving party must submit admissible evidence sufficient to generate a factual issue for trial or suffer an adverse judgment.[37]

III. *Is There A Triable Issue Regarding Whether The Defendant–Directors Breached Their Fiduciary Duties By Failing To Approve The Dickstein Change in Control For Purposes Of The Employment Agreements?*

Resolving whether summary judgment should be granted on the plaintiffs' fiduciary duty claims is made a bit more difficult by two factors. First, the plaintiffs and the defendant-directors have offered up virtually every possible standard of review as the appropriate prism through which to evaluate this question. For their part, the plaintiffs say that either the *Blasius Industries, Inc. v. Atlas Corp.*,[38] the *Unocal*,[39] or the entire fairness standard of review applies. The defendant-directors, meanwhile, contend that their decisions are to be reviewed under the deferential business judgment rule standard.

The second complicating factor is that the plaintiffs have no right to challenge the initial decision of the Hills board to enter into the Employment Agreements in 1994. Thus they have no right to challenge and therefore must concede that those Agreements were entered into for a proper purpose and that Hills received adequate consideration from the Covered Executives in exchange for their rights under those Agreements. As will be noted, the plaintiffs' current arguments often appear to be an attempt to second-guess Dickstein's own decision to accept the *Weiss* Action settlement and thereby waive any right on its own or Hills's part to challenge the decision of the Hills board to execute the Employment Agreements. I will not per-

---

**36.** *See, e.g., Williams v. Geier*, Del.Supr., 671 A.2d 1368, 1375 (1996).

**37.** *See, e.g., In re Liquidation of National Heritage Life Insur. Co.*, 728 A.2d 52, 56, *aff'd*, Del. Supr.723 A.2d 397 (1998).

**38.** Del.Ch., 564 A.2d 651 (1988).

**39.** 493 A.2d 946.

mit them to do so, but will only allow them to challenge whether the director-defendants made appropriate decisions in 1995 regarding whether to oppose the Dickstein Change in Control and to trigger the Covered Executives' Right to Severance.

### A. *What Is The Appropriate Standard Of Review?*

■ The plaintiffs' attack on the board's decision to trigger the Severance does not fall neatly within any of the traditional standards of review. But, for reasons I now explain by process of elimination, I believe it is most appropriate to apply the *Unocal* standard of review.

In reaching this conclusion, I start with a rejection of plaintiffs' argument that the *Blasius* compelling justification standard of review should apply. The plaintiffs are estopped from arguing and have produced no evidence that the Employment Agreements were entered into for the "primary purpose of thwarting the exercise of a stockholder vote."[40] Rather, they essentially admit that the Employment Agreements were executed as an incentive for current management to remain at Hills in the face of a takeover threat from Dickstein and that the double trigger was put in place to give the Hills board negotiating leverage with potential acquirors and to assuage the company's creditors. The rec-

ord is simply devoid of any hint that the Hills board decided to adopt the Employment Agreements as a method of placing pressure on the Hills electorate to vote against a Change in Control.[41]

Nor are the Employment Agreements the sort of corporate action that directly affects the electoral rules or process; rather, the plaintiffs contend that the Employment Agreements have the incidental effect of coercing or placing an undue toll on the free exercise of the shareholder vote. That is, the plaintiffs allege that the Severance under the Agreement exacts a financial penalty on the company and therefore the stockholders if they vote for an unapproved Change in Control. This, the plaintiffs contend, is sufficient to trigger *Blasius* review. Put simply, this is an argument that the *Blasius* standard is triggered because the Employment Agreements fail the proportionality prong of *Unocal*, which already proscribes coercive defensive measures. I admit that our case law often determines whether *Blasius* applies by examining whether the challenged corporate action is coercive or preclusive of electoral action, an exercise that is duplicative of *Unocal*.[42]

Rather than extend this unwieldy and redundant practice to corporate action that

---

**40.** *Blasius*, 564 A.2d at 660.

**41.** This distinguishes this case from *Sutton Holding Corp. v. DeSoto, Inc.*, Del.Ch., C.A. No. 12051, mem. op., 1991 WL 80223, 1991 Del.Ch. LEXIS 85, Allen, C. (May 14, 1991).

In *Sutton*, a company's pension plans provided that the plans could not be terminated nor benefits be reduced under the plans for five years following an unapproved change in control. In dicta, Chancellor Allen said that this provision of the plan appeared to implicate *Blasius*, because it was designed to deter a change in control (by denying an acquiror the opportunity to use excess pension funding to finance the acquisition) and not to create useful rights in pension plan beneficiaries.

*Id.*, at \*1–\*2, 1991 Del.Ch. LEXIS 85, at \*3–\*6. In this case, unlike *Sutton*, there is no evidence that the Hills's board's "dominant motivation" was to "seek to coerce shareholders in the exercise of the vote," *id.* at \*1, 1991 Del.Ch. LEXIS 85, at \*4 & \*3, and ample evidence that the Employment Agreements were intended to "create ... valuable economic right[s]" in the Covered Executives. *Id.* at \*1, 1991 Del.Ch. LEXIS 85, at \*4.

**42.** *See generally Chesapeake Corporation v. Shore*, Del.Ch., C.A. No. 17626, op. at 52–67, —— A.2d ——, ——–——, 2000 WL 151916, Strine, V.C. (Feb. 7, 2000, *rev.* Feb. 11, 2000).

is not directed specifically at the electoral process, I believe that it is more rational and efficient to apply the more flexible, but still exacting, *Unocal* standard in situations like this, but with a sharp eye out for electoral coercion.[43] In so concluding, I am conscious that a different approach could subject a variety of measures commonly reviewed under *Unocal* to *Blasius* scrutiny. For example, a termination fee payable in the event of a negative stockholder vote on a merger places the same sort of economic toll on the franchise as the Employment Agreements. Our law has traditionally reviewed the propriety of these fees under the *Unocal* or *Revlon*[44] standards depending on the circumstances,[45] or under the comparable liquidated damages standard used in the *Brazen* case.[46] Because these standards can already be applied to strike down termination fees or severance payments that coerce stockholders, there is no need to layer *Blasius* on top of them.

Similarly, I reject the plaintiffs' argument that *Blasius* applies because the defendant-directors informed the Hills stockholders of the financial and personnel effects under the Employment Agreements that could result from an unapproved Change in Control. "[T]he mere fact that the stockholders knew" that voting to approve the Dickstein Change in Control may trigger the Covered Executives' right to Severance "does not by itself constitute stockholder coercion."[47]

The Hills board was duty-bound to inform its stockholders of the possible financial and operational implications of a Change in Control.[48] The board did so, and Dickstein informed the stockholders of the same risks. There is no evidence in the record to support a claim that the Hills board purposely used the Severance lever so as to place unwarranted pressure on the Hills stockholders. Indeed, it would have been absurd for the board to use such a harmless weapon against Dickstein. *After all, Dickstein had assured the electorate that it could cover the Severance, refinance the company's debt facilities and senior notes, and offer a minimum of $22 plus $5 in PIK a share.* Given that this was Dickstein's electoral platform, there is no basis to conclude that the possibility of postelection Severance payments would coerce an electorate that Dickstein had already promised to largely cash out—regardless of whether that Severance was paid. At worst, stockholders knew that if the Severance was triggered they might lose out on Dickstein's promise that it would probably "raise [its] existing offer" if the Severance was not paid.[49]

The plaintiffs are also estopped from making the argument that the Severance is so large as to constitute a coercive influence on a Hills stockholder vote. When it was agreed and ordered that Hills could not bring suit challenging the Employment

---

43. *Id.* at 66, —— A.2d at ——.

44. *Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc.*, Del.Supr., 506 A.2d 173 (1985).

45. *See QVC Network v. Paramount Communications, Inc.*, Del.Ch., 635 A.2d 1245, 1271 (1993), *aff'd, Paramount Communications v. QVC Network Inc.*, Del.Supr., 637 A.2d 34 (1994).

46. *Brazen v. Bell Atlantic Corp.*, Del.Supr., 695 A.2d 43, 47–50 (1997).

47. *Brazen*, 695 A.2d at 50.

48. *In re General Motors Class H Shareholders Litig.*, Del.Ch., 734 A.2d 611, 620–621 (1999) (where board fulfilled its duty to inform stockholders of the implications of rejecting a board-proposed transaction in a non-threatening manner, no coercion was found).

49. DX 20.

Agreements, that agreement and order meant many things. One of them was that Hills was not entitled to claim that the level of the Severance in the Agreements was so excessive as to be coercive. Dickstein (who caused the Hills companies to bring this suit) cannot credibly claim that it was unaware of the magnitude of the Severance payments at the time it released its claims. Nor can Hills and the Hills stockholders who are bound by a similar release.

For different reasons, I reject plaintiffs' invitation to apply the entire fairness standard of review. In the purest sense, only three of the seven Hills directors had a self-dealing "interest" in the Employment Agreements.[50] Thus to the extent that plaintiffs wish me to concentrate solely on the June 22, 1995 vote of the Hills board to disapprove the Dickstein Change in Control for purposes of the Employment Agreements, the plaintiffs face the insuperable dilemma that a majority of disinterested directors made that decision. The plaintiffs, however, contend that all of the directors were interested because they desired reelection and that defendant Lee was interested because his firm received $250,000 annually to act as a financial advisor to Hills and because entities affiliated with Lee allegedly would have lost certain rights to purchase Hills shares at a favorable price if a merger with Dickstein occurred.

As to the latter point, the plaintiffs must present admissible evidence creating a genuine issue of material fact whether Lee is "interested" under the materiality standard applicable to non- § 144 interests under *Cede & Co. v. Technicolor, Inc.*[51] and *Cinerama, Inc. v. Technicolor, Inc.*[52] This they have not done. At oral argument, the defendant-directors assured me that Lee was far too wealthy to be influenced by the interests cited by plaintiffs. They backed this assertion up with an affidavit indicating that Lee's adjusted gross income for 1994 and 1995 combined was in excess of $200 million.[53] Moreover, I note that Lee (or his affiliated businesses) owned nearly 800,000 Hills shares during the spring and summer of 1995 and thus stood to receive over $20 million in proceeds if Dickstein's promised strategy panned out.[54]

Although it is true that the test to be applied is a subjective one,[55] that subjectivity does not permit a plaintiff to wait until trial to present *plausible* evidence of a material self-interest on the part of a director. The $250,000 that went to Lee's *firm* represents an infinitesimal proportion of his annual income. Moreover, the plaintiffs have failed to produce evidence that the rights Lee's affiliates possessed would in fact have been extinguished by a merger or other Change in Control, or that these rights overrode Lee's interest in maximizing his return from the 800,000 Hills shares he already controlled. Given these facts and the plaintiffs' failure (through depositions and other discovery) to demonstrate that Lee was abnormally obsessed (apologies to Benjamin Franklin) with (what to Lee are) pennies rather than

50. *See* 8 *Del. C.* § 144.

51. Del.Supr., 634 A.2d 345, 364 (1993) (subsequent history omitted).

52. Del.Supr., 663 A.2d 1156, 1169–71 (1995) (subsequent history omitted).

53. Given that the plaintiffs had ample opportunity to take discovery on this issue and have been permitted to advance new arguments in response to the affidavit, I will accept the affidavit as being non-prejudicial. The affidavit should have been presented sooner, however.

54. DX 1, at 15.

55. *Cede II,* 634 A.2d at 364.

dollars, I conclude that there is no triable issue regarding Lee's disinterested status.

Even if Lee was interested under the *Cinerama* and *Cede II* standards, it would not change my decision. To date, Delaware law has not taken the position that a board of directors' decision to oppose a takeover is subject to the entire fairness standard simply because a majority of the board has an "interest" in continuing to remain in control. Rather, the potential conflict always inherent in a challenge to a board's control is the very foundation for the *Unocal* standard of review itself. In the application of that standard, the court is to consider whether a majority of the directors have a financial or personal "interest" in securing the continuation of the incumbent board's control of the corporation,[56] but the presence of a majority of directors "interested" in this sense does not trigger the entire fairness standard of review unless the defensive measure under challenge is subject to fairness review by virtue of the application of 8 *Del. C.* § 144.[57] A credible argument can be made, of course, that a board's decision to take steps to maintain itself in office is an inherently self-interested decision that invariably ought to be evaluated under the exacting entire fairness standard.[58] But the extremity of this approach might well inhibit defensive action that is in fact stockholder-protective and act as a disincentive for qualified businesspeople to serve on boards. The current Delaware approach avoids these costs while providing stockholders with sufficient protection from improper entrenching tactics—so long as our courts apply *Unocal* with the appropriate rigor and sanction only well-justified and proportionate defensive measures.[59] Thus as an initial matter, it is inappropriate to apply the entire fairness standard of review.

Hence, the choice of the initial standard of review comes down to *Unocal* and the business judgment rule. Although the Employment Agreements are not so self-evidently defensive as a poison pill, their origin and purpose convince me that they have objectively defensive characteristics justifying heightened scrutiny.

The Employment Agreements were conceededly adopted as a "reaction to a perceived 'threat to corporate policy and effectiveness which touches upon issues of control.' "[60] The Hills board feared that it would lose management in the face of Dickstein's 1994 overtures. Not only that, the Hills board decided to adopt a double trigger approach so as to provide the board with negotiating leverage in the context of a change of control battle. This approach gave the board the flexibility to use the contractual Change in Control approval process as an incentive to a friendly transaction, as a tool to extract a higher bid from a potential acquiror, or as a financial barrier to an acquisition bid the board believed was inadvisable.[61]

Delaware case law has assured stockholders that the fact that the court has

---

56. *Unocal*, 493 A.2d at 955.

57. *Chesapeake Corp. v. Shore*, op. at 52 n. 32, at —— n. 32.

58. See Joel Seligman, *The New Corporate Law*, 59 BROOKLYN L. REV. 1, 11 (1993).

59. In this regard, one should not forget the proven willingness of Delaware courts to strike down purposely entrenching board action and even well-intentioned board action that has the primary purpose of thwarting a stockholder vote. *Schnell v. Chris–Craft Industries, Inc.*, Del.Supr., 285 A.2d 437 (1971); *Blasius*, 564 A.2d 651.

60. *Stroud v. Grace*, Del.Supr., 606 A.2d 75, 82 (1992) (*quoting Gilbert v. El Paso Co.*, Del. Supr., 575 A.2d 1131, 1144 (1990)).

61. See *MAI Basic Four, Inc. v. Prime Computer, Inc.*, Del.Ch., C.A. No. 10428, mem. op., 1988 WL 140221, mem. op., Hartnett, V.C.

approved a board's decision to put defenses in place on a clear day does not mean that the board will escape its burden to justify its use of those defenses in the heat of battle under the *Unocal* standard.[62] The "ominpresent specter that a board may be acting primarily in its own interests,"[63] is, if anything, more ominously haunting when a board is faced with an actual contest for control, such as was the case here, and must decide how to deploy its defensive arsenal.

By contrast, the defendant-directors would have me apply the business judgment rule because, according to them, there is no evidence that the Hills board decided to trigger the Severance in order to deter the Dickstein Change in Control. In support of this proposition, they cite to the board's decision to let the stockholders decide who should run the company in a fair election. I am reluctant, however, to adopt this approach, given the concededly defensive capabilities the double trigger gave the Hills board. Dickstein all but invited the board to sit down with it and negotiate an increase in its bid in exchange for a board decision not to trigger the Severance. Thus the board had the chance to exercise the sort of negotiating leverage the double trigger was intended to give it. Its decision how to exercise that leverage in an actual conflict is entitled to no more deference than its original decision to give itself that leverage. As a result, I conclude that the *Unocal* stan-

dard of review is appropriate in the first instance.

### B. *Has The Hills Board Demonstrated Its Entitlement To Summary Judgment Under The Unocal Standard?*

■ This case requires me to draw on the Supreme Court's assurance that "*Unocal* is not intended to lead to a structured, mechanistic, mathematical exercise."[64] As is well known, the *Unocal* test has two prongs. The first requires the board to demonstrate that, after a reasonable investigation, it determined in good faith that the corporation faced a threat warranting a defensive response.[65] The second requires the board to demonstrate the proportionality of its defensive measures to the threats it identified.[66] "[T]he presence of a majority of outside independent directors" materially enhances a board's ability to meet these burdens.[67]

In this case, the first prong is of preeminent importance. The plaintiffs waived their right to challenge the validity of the Employment Agreements. That waiver is consequential. The plaintiffs cannot in good faith claim that the Severance is a disproportionate response in a situation when the Hills board, on a good faith and informed basis, concluded that a Change in Control was adverse to the interests of Hills and its stockholders. To find otherwise would be to say that the plaintiffs waived *nothing* when they agreed not to challenge the adoption of the Employment Agreements.

---

(Dec. 20, 1988) (considering under *Unocal* standard whether a target board responded reasonably to a tender offer by, among other things, refusing to rescind severance rights payable to executives after a change in control).

**62.** *See, e.g., Moran v. Household International, Inc.,* Del.Supr., 500 A.2d 1346, 1354 (1985).

**63.** *Unocal,* 493 A.2d at 954.

**64.** *Unitrin, Inc. v. American Gen'l Corp.,* Del. Supr., 651 A.2d 1361, 1373 (1995).

**65.** *Unocal,* 493 A.2d at 955.

**66.** *Id.* at 955–57.

**67.** *Unitrin,* 651 A.2d at 1375; *Unocal,* 493 A.2d at 955; *Chesapeake Corp. v. Shore,* op. at 81 & n. 86, —— A.2d at —— & n. 86.

■ This is not to say that the board could ignore the circumstances facing the company in 1995 when it triggered the Severance, but it is to emphasize that the board's prior decision to promise the Covered Executives Severance in the context of a non-Approved Change in Control and the plaintiffs' waiver of the right to challenge that basic promise are critically important foundational facts. These facts greatly restrict the court's ability to second-guess the board's decision to trigger the Severance if the court concludes that the board has met its burden to demonstrate that it made a good faith and informed judgment that the Dickstein Change in Control was a threat to Hills and its stockholders.

Turning to that question, my job becomes surprisingly simple. The plaintiffs have failed to challenge the board's conclusion that the Dickstein Change in Control constituted a threat to Hills and its stockholders. In the face of abundant evidence supporting the board's determination, the plaintiffs have remained steadfastly mute. Thus they have conceded away most of their case.

I reach this conclusion because I reject the narrow prism through which the plaintiffs would have me view the board's actions. According to plaintiffs, the Hills board was duty-bound on June 22, 1995 to consider the narrow question of whether, if the Dickstein slate prevailed, as the board thought was likely, it was in the best interests of Hills to trigger the Severance rights of the Covered Executives.

In answering this narrow question, the plaintiffs suggest, the board was to ignore the fact that the Covered Executives had remained loyal employees during a period of corporate turbulence and had resisted the opportunity to go to work for other employers. The board was to ignore the fact that the Covered Executives had signed contracts that gave them the right to Severance unless the board *affirmatively approved* a Change in Control,[68] contracts that were subject to an implied covenant of good faith and fair dealing.[69] Finally, the board was to ignore the fact it had in good faith and with the advice of outside financial and legal advisors reached the judgment that the Dickstein Change in Control was adverse to the interests of the company and its stockholders.

Confessedly, the logic of this approach escapes my comprehension. Unless the Employment Agreements are read as containing a wholly illusory promise of Severance when the board does not approve a Change in Control, the plaintiffs' approach is baffling. Because I do not believe that a responsible board could read the Employment Agreements as providing the Covered Executives with an essentially phony promise, I do not accept the plaintiffs' approach.

Rather, the board's decision, per Finkelson's advice,[70] to take a consistent approach to the issue of whether to approve the Dickstein Change in Control was a reasonable response in the circumstances presented. Because the board had deter-

68. That is, the Employment Agreements clearly contemplate a right to Severance in the absence of a board vote on whether to approve a Change in Control. This weakens plaintiffs' argument that the board's supposed duty was to consider the Change in Control's advisability from the singular perspective of whether it was wise to trigger the Severance, assuming the Change in Control was in fact going to occur.

69. *Anthony's Pier Four, Inc., v. HBC Assocs.,* 411 Mass. 451, 583 N.E.2d 806, 820–21 (1991).

70. *See* 8 *Del. C.* § 141(e).

mined, for many sufficient reasons, that the Dickstein Change in Control was harmful to the company, it would have exercised bad faith under the Employment Agreements if it had voted to approve the Change in Control simply so as to avoid triggering the Covered Executives' right to Severance. After one party to a contract has given its consideration for a promised payment, it is often in the other party's narrow, selfish interest to accept that consideration and avoid the promised payment. Acting on that interest is commonly referred to as a breach of contract.

A majority of the Hills board had no self-interest in the Employment Agreement. Their decision to trigger the Severance because they believed that the Dickstein Change in Control was a harmful threat and because they believed that the company should live up to its contractual commitments was a reasonable decision in the circumstances. Having produced no evidence rebutting the board's showing that the Dickstein Change in Control was reasonably considered by it to be dangerous, the plaintiffs have failed to generate a triable question about whether the board has failed to meet its burden under *Unocal*. Notable in this regard is the fact that if Dickstein had been capable of doing what it assured the Hills stockholders it could do—consummating an acquisition of Hills that required the payment of the Severance and the refinancing of the company's debt and senior notes—this case would not be here.

C. *The Plaintiffs Have Not Otherwise Produced Evidence Of A Breach Of Fiduciary Duty Sufficient To Generate A Material Issue Of Fact For Trial*

Under *Unocal*, it putatively remains open to the plaintiffs to show that board action that has been found to be proper under heightened scrutiny is, nonetheless, invalid because it resulted from breaches of the duty of care or loyalty by the board.[71] The plaintiffs have not come close to generating a triable issue regarding whether the defendant-directors breached their fiduciary duties by failing to approve the Dickstein Change in Control for purposes of the Employment Agreements.

As to loyalty, a majority of the board had no interest in the Employment Agreements. On at least two occasions, this majority voted separately to consider whether to approve the Dickstein Change in Control and unanimously decided not to do so. Furthermore, there is no evidence that would support the proposition that the three interested directors either possessed the capability to or in fact did exercise undue influence on the disinterested majority. And the board's unrebutted showing that it legitimately opposed that Change in Control for good faith reasons makes any inference of a loyalty breach impossible.

Notably, this is not a situation where the plaintiffs have produced evidence that the board, realizing it was going to be thrown out of office, triggered the Severance out of spite or hard feelings. Evidence that would support a finding that board members were sore losers and took action out of a bad faith desire to exact revenge on the stockholders for voting the wrong way would justify a trial to determine whether the board had violated its duty of loyalty. But the plaintiffs have produced no evidence of this nature.

Finally, the plaintiffs have failed to submit evidence that would support a conclu-

---

71. *E.g., Unitrin*, 651 A.2d at 1373, 1390. *See In re Gaylord Container Shareholders Litig.*, Del.Ch., 753 A.2d 462, 473–477 (2000) (questioning the logic of this approach).

sion that the board breached its duty of care. Although the plaintiffs contend that the board ignored or gave inadequate weight to certain factors, their due care argument really rehashes their view that on June 22, 1995 the board was supposed to blind itself to its contractual obligations and its previous good-faith determination that the Dickstein Change in Control was inadvisable.

But the evidence is clear that the board believed that the departure of the Covered Executives would hurt the company; knew that at least some, if not all, of the Covered Executives were likely to depart if granted Severance; and understood the size of the payments to be made to the Covered Executives. Indeed, the board informed the Hills stockholders of all these issues. A proper application of the gross negligence standard therefore precludes judicial second-guessing of their presumptively good-faith decision to honor the agreements and oppose the Dickstein Change in Control.[72] The record evidence simply will not support a finding of gross negligence in the face of the substantial evidence of the board's careful consideration of the merits of the Dickstein Change in Control, the board's decision to allow the stockholders to choose that Change in Control in a fair election, and the board's reliance upon advice from respected outside advisors.[73]

■ For all these reasons, I grant summary judgment for the defendant-directors on the plaintiffs' claim that the board breached its fiduciary duties by failing to approve the Dickstein Change in Control for purposes of the Employment Agreements.[74]

72. A good example of the plaintiffs' unique approach to this case is their argument that the board should have considered amending the SERP to deprive the Covered Executives of their rights under that plan. That is, after the Covered Executives had stuck with the company the board was to amend the SERP at the last minute to deprive them of their promised benefits. This argument cannot bolster a due care claim.

73. I also note that the four defendant-directors who were not Covered Executives cannot be held responsible for monetary damages for a breach of their duty of care. The Hills charter has an exculpatory charter provision adopted under the authority of 8 *Del. C.* § 102(b)(7).

74. I also grant summary judgment to the defendant-directors on the plaintiffs' waste claim. The plaintiffs concede, as they must, that there was adequate consideration given by the Covered Executives for the Employment Agreements. But they contend that Hills derived no benefit from triggering the Severance on June 22, 1995 and thus the board's decision to fire that gun was a gift to the Covered Executives. The plaintiffs can only do so by disregarding the fact that the Covered Executives performed their obligations under the Agreement and remained with Hills during the Change in Control fight—that is, the Covered Executives had already given value under the contract. This argument does not come close to meeting the onerous test for waste. *See, e.g., Glazer v. Zapata, Corp.,* Del.Ch., 658 A.2d 176, 183 (1993) (waste claim must be supported by evidence that "an exchange ... is so one sided that no business person of ordinary, sound judgment could conclude that the corporation has received adequate consideration"); *see also Brehm v. Eisner,* Del.Supr., 746 A.2d 244, 263 (2000) (to effectively challenge a board's decision about executive compensation as waste, the plaintiff must demonstrate that the board acted "unconscionab[ly]" by "irrationally squander[ing] or giv[ing] away corporate assets").

But I deny the motion for summary judgment by defendants Bozic, Reen, and Matthews against plaintiffs' breach of contract claim based on their receipt of excess Severance payments. As fiduciaries of Hills, they are in no position to claim from Hills more than that to which they were contractually due. The funding of the Rabbi Trusts occurred while they were still on the Hills board, the Hills board had ultimate responsibility to ensure compliance with the Agreements, and Reen (Bozic's subordinate) was

IV. *Are The Plaintiffs Entitled To Summary Judgment On Their Claim That Defendants Bozic, Reen, and Matthews Received Severance In Excess Of That Called For By The Employment Agreements?*

■ The plaintiffs contend that defendants Bozic, Reen, and Matthews were paid Severance in an amount substantially greater than the Employment Agreements authorized.[75] Specifically, the plaintiffs allege that these defendants received a windfall because Hills included in the calculation of their Severance a totally discretionary, non-mandatory bonus (the "Special Bonus") that was paid to each of these Executives by the Hills board in early 1995 because of the company's strong 1994 performance. These Special Bonuses, which amounted to $100,000 for Bozic and $70,000 each for Reen and Matthews, were included in the Severance formula. As a result, the Special Bonuses were multiplied by three and the company was forced to pay gross-up taxes on these amounts—for a total payment of nearly $1.2 million.

For the following reasons, I find that there is no genuine issue of material fact regarding plaintiffs' entitlement to judgment on this claim, which is supported by the plain language of the Employment Agreements. Because the contractual language is dispositive to this issue I cite it now.

Under the Employment Agreements, a Covered Executive was to receive Severance in an amount equal to "three (3x) times [the Covered] Executive's Annual Compensation...."[76] "Annual Compensation," in turn, was defined as "the sum of (A) the [Covered] Executive's base salary for 1994 and (B) any bonus compensation to which [the Covered] Executive *would have been entitled* if [the Covered] Executive continued to be employed under [the] Agreement to the end of 1994 (assuming that all Company and individual performance goals and objectives had been achieved pursuant to Section 5(b)) [of this Agreement]...."[77] Under Section 5(b) of

---

the manager whose department calculated the Severance. Section 102(b)(7)(iv) of Title 8 precludes Bozic, Reen, and Matthews from claiming that they are insulated from any responsibility to repay overpayments made to them—overpayments they were in a position to have avoided in the first instance.

For a related reason I also deny the defendants' motion for summary judgment on the plaintiffs' unjust enrichment claim. Under either Massachusetts or Delaware law, the plaintiffs are only entitled to relief in this dispute *involving rights under written Employment Agreements* if they show that the Covered Executives received Severance improperly as a result of breaches of fiduciary duty by the defendant-directors or breaches of the Employment Agreements themselves. If the plaintiffs make either of the required showings of a fiduciary or contractual breach, relief necessary to ensure that the defendant-directors are not "unjustly enriched" will be awarded, *see Sanders v. Wang*, Del.Ch., C.A. No. 16640, mem. op. 1999 WL 1044880, at *10, Steele, V.C. (Nov. 8, 1999 rev. Nov. 10,

1999), but not because plaintiffs have proven a free-standing "unjust" enrichment claim. Nonetheless, I leave the unjust enrichment claim in the case for a narrow reason. Even if Bozic, Matthews, and Reen can convince me that they had no role in causing any excessive payments to themselves, they still would be unjustly enriched if they received them. Just as someone can't keep a mistakenly excessive tax refund or automatic teller pay out, these defendants cannot hold on to overpayments from the company to which they owed fiduciary duties.

75. The plaintiffs sought summary judgment on two other contractual claims. The defendants do not oppose the plaintiffs' motion as to those claims, and the parties have agreed to work together to formulate an agreed-upon order embodying the appropriate relief.

76. DX 7 § 10(c).

77. *Id.* There is one exception to this definition that the parties agree has no relevance to the

all of the Agreements, a "[Covered] Executive shall receive the bonuses specified in Schedule A upon the terms and conditions specified in Schedule A. Such bonuses shall be paid to [the Covered] Executive within sixty (60) days after the end of each of the Company's fiscal years during the term of this Agreement."[78] Schedule A, in turn, provides that the Covered Executive shall receive 50% of his base salary if he meets the annual goals established for him by the Hills board.[79]

 The Employment Agreements each contain a Massachusetts choice of law provision that is entitled to respect, given that Hills was headquartered in that state and that the Covered Executives performed the bulk of their services there.[80] Like Delaware courts, Massachusetts courts interpret contracts in accordance with their plain terms.[81] Unless the terms of the contract are inconsistent or can reasonably be read in two different ways, the contract is considered unambiguous and extrinsic evidence may not be used to vary or contradict its terms.[82]

In determining whether the discretionary bonuses were properly included in the

Severance paid to Bozic, Reen, and Matthews, the most important words of the Employment Agreements contract are "would have been entitled . . . ." Under the Employment Agreements, Bozic, Reen and Matthews were "entitled" only to the bonus compensation identified in Section 5(b) and further detailed in Schedule A of the Agreements.

The Special Bonuses awarded to them by the Hills board were not bonuses to which the Covered Executives "were entitled." Thus the Special Bonuses did not form a part of the Covered Executives' Annual Compensation and should not have been included in their Severance calculation. In fact, the defendants have failed to advance any argument that Bozic, Reen, and Matthews were entitled to the Special Bonuses they received on account of their 1994 performance. This failure is fatal to them.[83]

## V. *Conclusion*

For the foregoing reasons, I grant the defendants' motion for summary judgment as to the plaintiffs' claims for breach of fiduciary duty and waste; deny the defen-

current dispute regarding the Severance awarded defendants Bozic, Reen, and Matthews.

**78.** *Id.* § 5(b).

**79.** *Id.,* Sched. A.

**80.** *Wilmington Trust Co. v. Wilmington Trust Co.,* Del.Ch., 24 A.2d 309, 313 (1942).

**81.** *Suffolk Const. Co. v. Lanco Scaffolding Co.,* 47 Mass.App.Ct. 726, 716 N.E.2d 130, 133 (1999); *Boston Edison Co. v. Federal Energy Regulatory Commission,* 856 F.2d 361, 365–67 (1st Cir.1988).

**82.** *Davis v. Dawson, Inc.,* 15 F.Supp.2d 64, 107–08 (D.Mass.1998).

**83.** The defendants' extrinsic evidence cannot be used to vary the clear terms of the Agreements. *Merrimack Valley Nat'l Bank v. Baird,*

372 Mass. 721, 363 N.E.2d 688, 690 (1977); *Boston Edison Co.,* 856 F.2d at 366–67. Even if it were to be considered, it would not preclude summary judgment. All the defendants have presented is evidence that certain Foley, Hoag attorneys had differences of opinion regarding whether the Special Bonuses were to be included in the Severance calculation because they were paid in 1995, rather than 1994. These post-hoc debates hardly bear on the original meaning of § 10(c); moreover, the Foley, Hoag attorneys appear to have concluded that the Special Bonuses were not includable, although what they told their client is unclear. In any event, this evidence does not in any way support a finding that the Covered Executives were "entitled to" the Special Bonuses they received as a matter of grace on top of the § 5(b) bonuses they were contractually due.

dants' motion for summary judgment as to the plaintiffs' claim for breach of contract and unjust enrichment against defendants Bozic, Reen and Matthews; and grant the plaintiffs' motion for partial summary judgment on their breach of contract and unjust enrichment claims against defendants Bozic, Reen, and Matthews.[84] The parties are directed to confer about the appropriate form of order and to present such an order to me, along with an identification of the remaining issues in the case, no later than seven days from the date of this opinion.[85]

84. Under one, if not both of these theories, the plaintiffs are entitled to have these defendants return to Hills the contractually excessive payments made to them.

85. Among the issues the parties must discuss is the appropriate treatment of the gross-up tax payments on the Special Bonuses. The parties should reflect upon whether these payments can be recouped from the federal government through a refund process and how that affects the relief to be awarded on this claim.