**Lionel I. BRAZEN, Plaintiff Below, Appellant,**

v.

**BELL ATLANTIC CORPORATION, a Delaware corporation, and its individual directors, Raymond W. Smith, Lawrence T. Babbio, James G. Cullen, Frank C. Carlucci, Shirley Young, James H. Gilliam, Jr., William W. Adams, Thomas E. Bolger, William G. Copeland, Thomas H. Kean, John C. Marous, Jr., Rozanne L. Ridgeway, John F. Maypole, Joseph Neubauer, and Thomas O'Brien, Defendants Below, Appellees.**

**No. 130, 1997.**

Supreme Court of Delaware.

Submitted: April 22, 1997.
Decided: May 27, 1997.

---

**27.** *See* D.R.E. 609(a)(2); *Gregory v. State,* Del. Supr., 616 A.2d 1198, 1204 (1992).

**28.** D.R.E. 609(d).

**29.** *See Gregory,* 616 A.2d at 1204.

William Prickett (argued), Elizabeth M. McGeever, Ronald A. Brown, Jr., Prickett, Jones, Elliott, Kristol & Schnee, Wilmington; Clinton A. Krislov and William Bogot, of

counsel, Krislov & Associates, Ltd., Chicago, IL, for Appellant.

A. Gilchrist Sparks, III (argued), Alan J. Stone and S. Mark Hurd, Morris, Nichols, Arsht & Tunnell, Wilmington, for Appellees.

Before VEASEY, C.J., WALSH and BERGER, JJ.

VEASEY, Chief Justice:

In this appeal, the issues facing the Court surround the question of whether a two-tiered $550 million termination fee in a merger agreement is a valid liquidated damages provision or whether the termination fee was an invalid penalty and tended improperly to coerce stockholders into voting for the merger.

Although there are judgmental aspects involved in the traditional liquidated damages analysis applicable here, we do not apply the business judgment rule as such. We hold that the termination fee should be analyzed as a liquidated damages provision because the merger agreement specifically so provided. Under the appropriate test for liquidated damages, the provisions at issue here were reasonable in the context of this case. We further find that the fee was not a penalty and was not coercive. Accordingly, we affirm the judgment of the Court of Chancery, but upon an analysis that differs somewhat from the rationale of that Court.

### Facts

In 1995, defendant below-appellee, Bell Atlantic Corporation, and NYNEX Corporation entered into merger negotiations. In January 1996, NYNEX circulated an initial draft merger agreement that included a termination fee provision. Both parties to the agreement determined that the merger should be a stock-for-stock transaction and be treated as a merger of equals. Thus, to the extent possible, the provisions of the merger agreement, including the termination fee, were to be reciprocal.

Representatives of Bell Atlantic and NYNEX agreed that a two-tiered $550 million termination fee was reasonable for compensating either party for damages incurred if the merger did not take place because of certain enumerated events. The termination fee was divided into two parts. First, either party would be required to pay $200 million if there were both a competing acquisition offer for that party and either (a) a failure to obtain stockholder approval, or (b) a termination of the agreement. Second, if a competing transaction were consummated within eighteen months of termination of the merger agreement, the consummating party would be required to pay an additional $350 million to its disappointed merger partner.

In the negotiations where such a fee was discussed, the parties took into account the losses each would have suffered as a result of having focused attention solely on the merger to the exclusion of other significant opportunities for mergers and acquisitions in the telecommunications industry. The parties concluded that, with the recent passage of the national Telecommunications Act of 1996, the entire competitive landscape had been transformed for the regional Bell operating companies, creating a flurry of business combinations. The parties further concluded that the prospect of missing out on alternative transactions due to the pendency of the merger was very real. The "lost opportunity" cost issue loomed large. The negotiators also considered as factors in determining the size of the termination fee (a) the size of termination fees in other merger agreements found reasonable by Delaware courts, and (b) the lengthy period during which the parties would be subject to restrictive covenants under the merger agreement while regulatory approvals were sought.

Bell Atlantic and NYNEX decided that $550 million, which represented about 2% of Bell Atlantic's approximately $28 billion market capitalization, would serve as a "reasonable proxy" for the opportunity cost and other losses associated with the termination of the merger. In addition, senior management advised Bell Atlantic's board of directors that the termination fee was at a level consistent with percentages approved by Delaware courts in earlier transactions, and that the likelihood of a higher offer emerging for either Bell Atlantic or NYNEX was very low.

The termination fee provision states:

If (I) this Agreement (A) is terminated by NYNEX pursuant to Section 9.1(f) hereof or NYNEX or Bell Atlantic pursuant to Section 9.1(g) hereof because of the failure to obtain the required approval from the Bell Atlantic stockholders or by Bell Atlantic pursuant to Section 9.1(h) hereof, or (B) is terminated as a result of Bell Atlantic's material breach of Section 7.2 hereof which is not cured within 30 days after notice thereof to Bell Atlantic and (ii) at the time of such termination or prior to the meeting of Bell Atlantic's stockholders there shall have been an Acquisition Proposal (as defined in Section 6.3 hereof) involving Bell Atlantic or any of its Significant Subsidiaries (whether or not such offer shall have been rejected or shall have been withdrawn prior to the time of such termination or of the meeting), Bell Atlantic shall pay to NYNEX a termination fee of $200 million (the "Initial Bell Atlantic Termination Fee"). In addition, if, within one and one-half years of any such termination described in clause (I) of the immediately preceding sentence that gave rise to the obligation to pay the Initial Bell Atlantic Termination Fee, Bell Atlantic, or the Significant Subsidiary of Bell Atlantic which was the subject of such Acquisition Proposal (the "Bell Atlantic Target Party"), becomes a subsidiary of the person which made (or the affiliate of which made) an Acquisition Proposal described in clause (ii) of the immediately preceding sentence or of any Offering Person or accepts a written offer to consummate or consummates an Acquisition Proposal with such person or any Offering Person, then, upon the signing of a definitive agreement relating to any such Acquisition Proposal, or, if no such agreement is signed then at the closing (and as a condition to the closing) of such Bell Atlantic Target Party becoming such a subsidiary or of any such Acquisition Proposal, Bell Atlantic shall pay to NYNEX an additional termination fee equal to $350 million.[1]

In addition, section 9.2(e) of the merger agreement states,

> NYNEX and Bell Atlantic agree that the agreements contained in Sections 9.2(b) and (c) above are an integral part of the transactions contemplated by this Agreement and *constitute liquidated damages and not a penalty.* If one Party fails to promptly pay to the other any fee due under such Sections 9.2(b) and (c), the defaulting Party shall pay the costs and expenses (including legal fees and expenses) in connection with any action, including the filing of any lawsuit or other legal action, taken to collect payment, together with interest on the amount of any unpaid fee at the publicly announced prime rate of Citibank, N.A. from the date such fee was required to be paid.[2]

Finally, section 9.2(a), also pertinent to this appeal, states,

> In the event of termination of this Agreement as provided in Section 9.1 hereof, and subject to the provisions of Section 10.1 hereof, this Agreement shall forthwith become void and there shall be no liability on the part of any of the Parties except (I) as set forth in this Section 9.2 . . . and (ii) nothing herein shall relieve any Party from liability for any willful breach hereof.[3]

Plaintiff below-appellant, Lionel L. Brazen, a Bell Atlantic stockholder, filed a class action against Bell Atlantic and its directors for declaratory and injunctive relief. Plaintiff alleged that the termination fee was not a valid liquidated damages clause because it failed to reflect an estimate of actual expenses incurred in preparation for the merger. Plaintiffs alleged that the $550 million payment was "an unconscionably high termination or 'lockup' fee," employed "to restrict and impair the exercise of the fiduciary duty of the Bell Atlantic board and coerce the shareholders to vote to approve the proposed

---

1. Amended and Restated Agreement and Plan of Merger dated as of April 21, 1996 (the Merger Agreement) § 9.2(c). Section 9.2(b) contains identical language, except that the term NYNEX is replaced by the term Bell Atlantic and vice versa.

2. Merger Agreement § 9.2(e) (emphasis added).

3. *Id.* at § 9.2(a).

merger...." [4]

The parties filed cross-motions for summary judgment. Bell Atlantic sought a declaration that the decision to include and structure the termination fee was a valid exercise of business judgment. The Court of Chancery denied the relief sought by plaintiff after concluding that the termination fee structure and terms were protected by the business judgment rule and that plaintiff failed to rebut its presumptions. [5]

### Scope And Standard of Review

On appeal, this Court reviews de novo both as to the facts and the law a Court of Chancery decision on a motion for summary judgment. [6] "Where the court is presented with cross-motions for summary judgment, neither party's motion will be granted unless no genuine issue of material fact exists and one of the parties is entitled to judgment as a matter of law." [7]

### Termination Fee as Liquidated Damages

█ The Court of Chancery determined that the proper method for analyzing the termination fee in this merger agreement was to employ the business judgment rule rather than the test accepted by Delaware courts for analyzing the validity of liquidated damages provisions. In arriving at this determination, the Court of Chancery concluded that a liquidated damages analysis was not appropriate in this case because, notwithstanding section 9.2(e) of the merger agreement, which states that the $550 million fee constitutes liquidated damages,

the event which triggers payment of the fees is not a breach but a termination.

Liquidated damages, by definition, are damages paid in the event of a breach.... In addition, the Merger Agreement clearly provides that nothing in the Agreement (including the payment of termination fees) "shall relieve any Party from liability for any willful breach hereof." Accordingly, the Boards' decision to include these termination fees, which are triggered by a *termination* of the Merger Agreement and payment of which will not hinder either party's ability to recover damages from a breach, is protected by the business judgment rule and the fees will not be struck down unless plaintiff demonstrates that their inclusion was the result of disloyal or grossly negligent acts. [8]

Plaintiff argued below and argues again here that the proper analysis for determining the validity of the termination fee in section 9.2(c) of the merger agreement is to analyze it as a liquidated damages clause employing a test different from the business judgment rule. We agree.

The express language in section 9.2(e) of the agreement unambiguously states that the termination fee provisions "constitute liquidated damages and not a penalty." [9] The Court of Chancery correctly found that liquidated damages, by definition, are damages paid in the event of a breach of a contract. [10] While a breach of the merger agreement is not the only event that would trigger payment of the termination fee, the express language of section 9.2(c) states that a party's breach of section 7.2 (which provides that the parties are required to take all action necessary to convene a stockholders' meeting and use all commercially reasonable efforts to secure proxies to be voted in favor of the merger), coupled with other events, may trig-

---

4. *Brazen v. Bell Atlantic Corp.*, Del. Ch., C.A. No. 14976, slip op. at 1, 1997 WL 153810 (Mar. 19, 1997).

5. *Id.* at 12.

6. *Arnold v. Society for Savings Bancorp, Inc.*, Del.Supr., 678 A.2d 533, 535 (1996).

7. *Empire of America Relocation Services v. Commercial Credit*, Del.Supr., 551 A.2d 433, 435 (1988) (citations omitted).

8. Slip op. at 8–10 (quoting Merger Agreement § 9.2(a)(ii)) (footnotes omitted).

9. At oral argument in this Court, counsel for Bell Atlantic explained that the liquidated damages language was "boilerplate" terminology for termination fees in merger transactions such as this one. So be it, but in our view, the drafters of corporate documents bear the responsibility for the selection of appropriate and clear language. *See Kaiser v. Matheson*, Del.Supr., 681 A.2d 392, 398–99 (1996). Accordingly, the parties to this merger cannot disown their own language.

10. Slip op. at 8; RESTATEMENT (SECOND) OF CONTRACTS § 356 (1981).

ger a party's obligation to pay the termination fee.

Thus, we find no compelling justification for treating the termination fee in this agreement as anything but a liquidated damages provision, in light of the express intent of the parties to have it so treated.[11]

### Analyzing the Validity of Liquidated Damages

In *Lee Builders v. Wells*, a case involving a liquidated damages provision equal to 5% of the purchase price in a contract for the sale of land, the Court of Chancery articulated the following two-prong test for analyzing the validity of the amount of liquidated damages: "Where the damages are uncertain and the amount agreed upon is reasonable, such an agreement will not be disturbed."[12]

Plaintiff argues that the termination fee, if properly analyzed as liquidated damages, fails the *Lee Builders* test because both portions of the fee are punitive rather than compensatory, having nothing to do with actual damages but instead being designed to punish Bell Atlantic stockholders and the subsequent third-party acquirer if Bell Atlantic were ultimately to agree to merge with another entity. We find, however, that the termination fee safely passes both prongs of the *Lee Builders* test.

To be a valid liquidated damages provision under the first prong of the test, the damages that would result from a breach of the merger agreement must be uncertain or incapable of accurate calculation. Plaintiff does not attack the fee on this ground. Given the volatility and uncertainty in the tele-

communications industry due to enactment of the Telecommunications Act of 1996 and the fast pace of technological change, one is led ineluctably to the conclusion that advance calculation of actual damages in this case approaches near impossibility.

Plaintiff contends, however, that the $550 million fee violates the second prong of the *Lee Builders* test, i.e., that it is not a reasonable forecast of actual damages, but rather a penalty intended to punish the stockholders of Bell Atlantic for not approving the merger. Plaintiff's attack is without force. Two factors are relevant to a determination of whether the amount fixed as liquidated damages is reasonable. The first factor is the anticipated loss by either party should the merger not occur. The second factor is the difficulty of calculating that loss: the greater the difficulty, the easier it is to show that the amount fixed was reasonable.[13] In fact, where the level of uncertainty surrounding a given transaction is high, "[e]xperience has shown that ... the award of a court or jury is no more likely to be exact compensation than is the advance estimate of the parties themselves."[14] Thus, to fail the second prong of *Lee Builders*, the amount at issue must be unconscionable[15] or not rationally related to any measure of damages a party might conceivably sustain.[16]

Here, in the face of significant uncertainty, Bell Atlantic and NYNEX negotiated a fee amount and a fee structure that take into account the following: (a) the lost opportunity costs associated with a contract to deal exclusively with each other; (b) the expenses incurred during the course of nego-

---

11.  Such treatment is not without precedent. In *Kysor Indus. Corp. v. Margaux, Inc.*, Del.Super., 674 A.2d 889 (1996), the contractual language analyzed by the court stated, "In the event that Margaux breaches its undertakings, ... Margaux shall promptly ... (b) pay as liquidated damages to Kysor a termination fee equal to Three Hundred Thousand Dollars ($300,000)." *Id.* at 892–93. The Superior Court analyzed the termination fee, not as a termination fee, but as liquidated damages. Because the analytical approach employed by the Superior Court in *Kysor* would give force and effect to both sections 9.2(c) and 9.2(e) of the merger agreement now before this Court, analyzing the termination fee under the liquidated damages rubric is the better approach.

12.  *Lee Builders v. Wells*, Del. Ch., 103 A.2d 918, 919 (1954); *accord Wilmington Housing Authority v. Pan Builders, Inc.*, D.Del., 665 F.Supp. 351, 354 (1987); RESTATEMENT (SECOND) OF CONTRACTS § 356 (1981).

13.  RESTATEMENT (SECOND) OF CONTRACTS § 356 cmt. b (1981).

14.  5 ARTHUR L. CORBIN, CORBIN ON CONTRACTS § 1060, at 348 (1964).

15.  *See Lee Builders*, 103 A.2d at 919.

16.  *See Meyer Ventures, Inc. v. Barnak*, Del. Ch., C.A. No. 11502, slip op. at 11–12, Allen, C., 1990 WL 172648 (Nov. 2, 1990).

tiating the transaction; (c) the likelihood of a higher bid emerging for the acquisition of either party; and (d) the size of termination fees in other merger transactions. The parties then settled on the $550 million fee as reasonable given these factors. Moreover, the $550 million fee represents 2% of Bell Atlantic's market capitalization of $28 billion. This percentage falls well within the range of termination fees upheld as reasonable by the courts of this State.[17] We hold that it is within a range of reasonableness and is not a penalty.

■ This is not strictly a business judgment rule case. If it were, the Court would not be applying a reasonableness test. The business judgment rule is a presumption that directors are acting independently, in good faith and with due care in making a business decision. It applies when that decision is questioned and the analysis is primarily a process inquiry.[18] Courts give deference to directors' decisions reached by a proper process, and do not apply an objective reasonableness test in such a case to examine the wisdom of the decision itself.[19]

■ Since we are applying the liquidated damages rubric, and not the business judgment rule, it is appropriate to apply a reasonableness test, which in some respects is analogous to some of the heightened scrutiny processes employed by our courts in certain other contexts. Even then, courts will not substitute their business judgment for that of the directors, but will examine the decision to assure that it is, "on balance, within a range of reasonableness."[20] Is the liquidated damages provision here within the range of reasonableness? We believe that it is, given the undisputed record showing the size of the transaction, the analysis of the parties concerning lost opportunity costs, other expenses and the arms-length negotiations.

■ Plaintiff further argues that the termination fee provision was coercive. Plaintiff contends that (a) the stockholders never had an option to consider the merger agreement without the fee, and (b) regardless of what the stockholders thought of the merits of the transaction, the stockholders knew that if they voted against the transaction, they might well be imposing a $550 million penalty on their company. Plaintiff contends that the termination fee was so enormous that it "influenced" the vote. Finally, plain-

17. *See, e.g., Kysor,* 674 A.2d at 897 (where the Superior Court held that a termination fee of 2.8% of Kysor's offer was reasonable); *Roberts v. General Instrument Corp.,* Del. Ch., C.A. No. 11639, slip op. at 21, Allen, C., 1990 WL 118356 (Aug. 13, 1990) (breakup fee of 2% described as "limited"); *Lewis v. Leaseway Transp. Corp.,* Del. Ch., C.A. No. 8720, slip op. at 6, Chandler, V.C., 1990 WL 67383 (May 16, 1990) (dismissing challenge to a transaction which included a breakup fee and related expenses of approximately 3% of transaction value); *Braunschweiger v. American Home Shield Corp.,* Del. Ch., C.A. No. 10755, slip op. at 19–20, Allen, C., 1989 WL 128571 (Oct. 26, 1989) (2.3% breakup fee found not to be onerous).

18. *Aronson v. Lewis,* Del.Supr., 473 A.2d 805, 812 (1984).

19. *Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d 34, 42 (1993). ("Under normal circumstances, neither the courts nor the stockholders should interfere with the managerial decisions of the directors. The business judgment rule embodies the deference to which such decisions are entitled.... Nevertheless, there are rare situations ... [where the business judgment rule does not apply and] a court subjects the directors' conduct to enhanced

scrutiny to ensure that it is reasonable."); *Sinclair Oil Corp. v. Levien,* Del.Supr., 280 A.2d 717, 720 (1971) ("A board of directors enjoys a presumption of sound business judgment, and its decisions will not be disturbed if they can be attributed to any rational business purpose.").

20. *QVC,* 637 A.2d at 45. It is to be noted that, in *QVC,* the termination fee of $100 million, which was 1.2% of the original merger agreement, was upheld by the Vice Chancellor because it "represents a fair liquidated amount to cover Viacom's expenses should the Paramount–Viacom merger not be consummated." *QVC Network, Inc. v. Paramount Communications, Inc.,* Del. Ch., 635 A.2d 1245, 1271 (1993), *aff'd on other grounds, Paramount Communications, Inc. v. QVC Network, Inc.,* Del.Supr., 637 A.2d at 50 n. 22 and accompanying text (termination fee considered in context with other measures in that case was problematic, but termination fee, standing alone, was not considered by Supreme Court since there was no cross-appeal to present the issue). *See also In re J.P. Stevens & Co., Inc. Shareholders Litigation,* Del. Ch., 542 A.2d 770, 783 (1988), *interlocutory appeal refused,* Del.Supr., 1988 WL 35145, 1988 DEL. LEXIS 103 (Apr. 12, 1988) (reasonable termination fee negotiated in good faith upheld as conventional and not product of disloyal action).

tiff argues that the fee provision was meant to be coercive because the drafters deliberately crafted the termination fees to make them applicable when Bell Atlantic's stockholders decline to approve the transaction as opposed to a termination resulting from causes other than the non-approval of the Bell Atlantic stockholders. We find plaintiff's arguments unpersuasive.

First, the Court of Chancery properly found that the termination fee was not egregiously large. Second, the mere fact that the stockholders knew that voting to disapprove the merger may result in activation of the termination fee does not by itself constitute stockholder coercion. Third, we find no authority to support plaintiff's proposition that a fee is coercive because it can be triggered upon stockholder disapproval of the merger agreement, but not upon the occurrence of other events resulting in termination of the agreement.

In *Williams v. Geier*, this Court enunciated the test for stockholder coercion. Wrongful coercion that nullifies a stockholder vote may exist "where the board or some other party takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction." [21] But we also stated in *Williams v. Geier* that "[i]n the final analysis ... the determination of whether a particular stockholder vote has been robbed of its effectiveness by impermissible coercion depends on the facts of the case." [22]

In this case, the proxy materials sent to stockholders described very clearly the terms of the termination fee. Since the termination fee was a valid, enforceable part of the merger agreement, disclosure of the fee provision to stockholders was proper and necessary. [23] Plaintiff has not produced any evidence to show that the stockholders were forced into voting for the merger for reasons other than the merits of the transaction. To the contrary, it appears that the reciprocal termi-

nation fee provisions, drafted to protect both Bell Atlantic and NYNEX in the event the merger was not consummated, were an integral part of the merits of the transaction. Thus, we agree with the finding of the Court of Chancery that, although the termination fee provision may have influenced the stockholder vote, there were "no structurally or situationally coercive factors" that made an otherwise valid fee provision impermissibly coercive in this setting. [24]

### Conclusion

Because we find that actual damages in this case do not lend themselves to reasonably exact calculation, and because we further find that the $550 million termination fee was a reasonable forecast of damages and that the fee was neither coercive nor unconscionable, we hold that the fee is a valid liquidated damages provision in this merger agreement.

In light of the foregoing, we affirm, albeit on somewhat different grounds, the judgment of the Court of Chancery.

---

**21.** *Williams v. Geier*, Del.Supr., 671 A.2d 1368, 1382–83 (1996) (citations omitted).

**22.** *Id.* at 1383.

**23.** *Id.* (The board is "required to disclose the reality of the situation ... [and] could not couch

these disclosures in vague or euphemistic language, or in terms that would deprive stockholders of their right to choose.")

**24.** *Brazen v. Bell Atlantic Corp.,* Del. Ch., C.A. No. 14976, slip op. at 14 (Mar. 19, 1997).