FOURTH DIVISION
March 8, 2007

No. 1-05-3849

| | | |
|---|---|---|
| SERENE SHAPER and LIONEL BRAZEN, | ) | Appeal from |
| | ) | the Circuit Court |
| Plaintiffs-Appellants, | ) | of Cook County. |
| | ) | |
| v. | ) | |
| | ) | |
| JOHN H. BRYAN, STEPHEN B. BURKE, JAMES S. | ) | |
| CROWN, JAMES DIMON, DR. MAUREEN A. FAY, | ) | |
| O.P., JOHN R. HALL, LABAN P. JACKSON, JR., | ) | |
| JOHN W. KESSLER, ROBERT I. LIPP, RICHARD A. | ) | |
| MANOOGIAN, DAVID C. NOVAK, JOHN W. | ) | Honorable |
| ROGERS, JR. and FREDERICK R. STRATTON, JR., | ) | Mary Anne Mason, |
| | ) | Judge Presiding. |
| Defendants-Appellees, | ) | |
| | ) | |
| (Bank One Corporation, | ) | |
| | ) | |
| Nominal Defendant). | ) | |

PRESIDING JUSTICE QUINN delivered the opinion of the court:

Plaintiff shareholders of the former Bank One Corporation (Bank One) filed a complaint against certain members of the board of directors (Board), alleging that the Board breached its fiduciary duties during the negotiation and approval of Bank One's merger with J.P. Morgan Chase & Co. (J.P. Morgan). The circuit court granted defendants' motion to dismiss plaintiffs' second amended complaint with prejudice, and plaintiffs now appeal. On appeal, plaintiffs

contend that the circuit court erred by dismissing their second amended complaint, where plaintiffs alleged sufficient facts to both rebut the presumption of the business judgment rule and substitute a heightened standard of scrutiny for the business judgment rule. For the following reasons, we affirm.

## I. Background

Prior to its merger with J.P. Morgan, Bank One was engaged in the businesses of retail banking, commercial banking, credit card services, investment management and private client services. J.P. Morgan is a global financial services firm engaged in investment banking, financial services for consumers and businesses, financial transaction processing, investment management, private banking and private equity.

On January 14, 2004, J.P. Morgan and Bank One announced that J.P. Morgan would acquire Bank One by a merger of the two companies, resulting in what was expected to create the second largest financial institution in the country, measured by total assets. Pursuant to the agreed-upon merger, J.P. Morgan would issue shares of its common stock to Bank One shareholders at a premium of 14% over the closing prices of Bank One common stock on the date of the announcement of the merger. The terms of the merger agreement were included in the joint proxy statement filed with the Securities and Exchange Commission.

The merger agreement provided a succession plan for J.P. Morgan. Following the merger, the chief executive officer (CEO) of J.P. Morgan, William B. Harrison, Jr., would continue as CEO for two years, after which time the CEO of Bank One, defendant James Dimon, would succeed Harrison. During the interim two years, Dimon would serve as president and

chief operating officer (COO) of J.P. Morgan. Harrison, who was chairman of J.P. Morgan before the merger, would continue in that role indefinitely beyond the two years. The merger agreement also described the compensation Dimon was to receive, following the merger, under his employment agreement with J.P. Morgan. Dimon was provided a "pay pledge," in which he was to receive an annual base salary of $1 million and annual bonuses and equity-based awards no less than 90% of the value of those provided to Harrison.

The merger agreement included a provision requiring both Bank One and J.P. Morgan to pay a termination fee to the other of up to $2.3 billion if either party terminated the merger agreement for various reasons, including the failure of a party's board to recommend the merger and the breach by a party of its obligation to call a meeting and use its reasonable best efforts to obtain the approval of its shareholders. The termination fee provision also provided that if the merger agreement was terminated by either party because the required stockholder vote of a party was not obtained at that party's stockholders' meeting and a competing acquisition proposal for that party was publicly announced before its stockholders' meeting, then the party whose stockholders failed to approve the merger would owe the other party one-third of the termination fee and the remaining two-thirds of the termination fee would become payable to the other party if the terminating party enters into an agreement or completes an acquisition within 18 months of the termination of the merger agreement. The termination fee provision also provided that if: (1) the merger agreement was terminated by either party because the merger had not been consummated by January 14, 2005, or because of a material breach by the other party that causes a condition to the merger to not be satisfied; (2) a competing acquisition proposal for a party was

made before the merger agreement was terminated; and (3) after the announcement of the competing acquisition proposal, the party for which the competing acquisition proposal was made intentionally breached any of its representations, warranties, covenants or agreements and the breach materially contributed to the failure of the merger to become effective, then the party that committed the breach will owe the other party one-third of the termination fee, and if within 18 months after this termination of the merger agreement the breaching party enters into an agreement for, or completes, an acquisition proposal, the remaining two-thirds of the termination fee will become payable to the other party.

The merger agreement also included a reciprocal stock option agreement between J.P. Morgan and Bank One, in which each party granted the other an irrevocable option to purchase, in whole or in part, up to 19% of its outstanding common stock. The stock option granted by Bank One had an exercise price of $44.61 a share, and J.P. Morgan's stock option had an exercise price of $38.90 a share. The stock options could be exercised, in whole or in part, if the merger agreement is terminated because the breaching company changes or withdraws its recommendation of the merger, recommends an alternative merger, or fails to call its shareholders' meeting to vote on the merger, or if a third party acquires 20% or more of the company.

The merger agreement further described Bank One's negotiation and investigation of the proposed merger. The Board of Bank One conducted several meetings with legal and financial advisors in January 2004, to review and discuss strategic considerations relating to the proposed merger, the due diligence review of J.P. Morgan, the status of discussions regarding the terms of

the proposed merger, and financial information regarding the proposed merger. The Board received a formal opinion from Lazard, Frères & Co., LLC (Lazard), an investment banking firm, that the proposed merger provided a fair exchange ratio to holders of Bank One common stock. The Board's reasons for recommending that the shareholders approve the merger included the exchange ratio of Bank One stock and other financial considerations, the value of the succession of management with the assurance that Dimon would become CEO of the merged institution in two years, strategic fit and synergistic results of a combination of the two companies, growth potential, and long-term viability of the combined company. On May 25, 2004, the shareholders of Bank One approved the merger and the merger closed July 1, 2004.

On June 26, 2004, just days before the merger closed, *The New York Times* printed an article that described preliminary negotiations between Harrison and Dimon. According to the article, Dimon offered to sell Bank One to J.P. Morgan at no premium if he were appointed CEO of the new entity immediately. The article specifically stated:

> "During the negotiations with Mr. Dimon, [Harrison] fought hard to give himself
> the two extra years, to secure a smooth transition, although he may have cost J.P.
> Morgan shareholders extra money in doing so. Mr. Dimon, always the tough deal
> maker, offered to do the deal for no premium if he could become chief executive
> [officer] immediately, according to two people close to the deal.
> When Mr. Harrison resisted, Mr. Dimon insisted on a premium, which Mr.
> Harrison was able to push down to 14%. The two men declined comment on the
> specifics of their negotiations." Landon Thomas, Jr., <u>The Yin, the Yang and the</u>

5

Deal, N.Y. Times, June 27, 2004, §3 (Sunday Business), at 1.

On July 22, 2005, plaintiffs filed their second amended complaint, in which they cite two articles from Crain's Chicago Business, discussing the merger. On January 19, 2004, an article stated that Dimon's position concerning the merger was that "[g]arnering a relatively meager 15% premium *** [was] better than taking a 30% [premium] deal from a lot of players out there." The article stated that Dimon "didn't look into what he could get for Bank One shareholders from other financial companies eager to bulk up as a new wave of bank buyouts appears to be under way." The article provided the following statements regarding the market's reaction to the merger:

> "The stock market's reaction to the deal last week confirms, by one measure at least, the notion that Bank One sold out cheap. As of Thursday's market close, Bank One's total market value had increased by $5.77 billion, while J.P. Morgan's had decreased by just $620 million. Subtracting J.P. Morgan's modest decline from Bank One's big gain results in a net increase in market value for both companies of $5.15 billion.
>
> Acquirers typically suffer at least a short-term drop in stock price, while their targets see an increase. A fully priced takeover ought to result in a wash between the two, says Thomas McCandless, banking analyst with Deutsche Bank in New York.
>
> * * *
>
> Using that logic, the market is saying that Bank One could have obtained $4.55

per share more from J.P. Morgan than it got without overly punishing J.P.
Morgan's stock.  Adding that $4.55 to the $51.77 per share that Bank One
received results in a takeover price of $56.32, or $63 billion, a 25% premium
to Bank One's Wednesday close of $45.22."  Steve Daniels, *Money Left on
Table; Dimon's Career v. Bank One's Best Price?*,Crain's Chicago Business,
January 19, 2004.

On the same date, another article in Crain's Chicago Business provided the following discussion:

"J.P. Morgan isn't the only, and certainly isn't the best, merger candidate
for Bank One.  The New York bank is heavy on exposure to volatile businesses
such as investment banking, big-ticket corporate lending and securities trading.
Bank One by comparison, partly thanks to Mr. Dimon's efforts, has a more staid
book of business, lending to consumers and small companies.  Less glitz, less risk.

Wells Fargo & Co., Wachovia Corp., and Bank of America Corp. are all
banks with business mixes closer to that of Bank One and, in the view of some,
could have made more suitable partners.  One of them, Bank of America, agreed
late last year to buy FleetBoston Financial Corp. for about $50 billion, a valuation
that makes it look like Bank One went cheaply.  Mr. Dimon tells our reporter that
he didn't shop Bank One around.  This deal is the perfect fit, he says.  For him it
is.  Those other banks aren't based in New York." *J.P. Morgan's a Great Catch-
but for whom?*, Crain's Chicago Business, January 19, 2004.

In their second amended complaint, plaintiffs alleged that the defendants, as officers and

7

directors of Bank One, owed fiduciary duties to plaintiffs to act in good faith and with loyalty regarding any business decisions concerning Bank One. Plaintiffs first alleged that defendants breached their fiduciary duties where the merger agreement for a 14% premium to Bank One shareholders was inadequate and where defendants should have sought out a more profitable transaction by opening the acquisition of Bank One up to other bidders. Secondly, plaintiffs alleged that Dimon suffered from certain conflicts when negotiating the terms of the merger, namely, his postmerger compensation and succession of Harrison as CEO. Plaintiffs maintained that the 14% premium was proposed only after Dimon's secret no-premium offer in exchange for immediately becoming CEO was rejected by Harrison. Lastly, plaintiffs alleged that the Board's approval of the merger terms that included a termination fee and a grant of cross-options created an insurmountable obstacle to a higher offer. On November 22, 2005, the circuit court granted defendants' motion to dismiss plaintiffs' second amended complaint pursuant to section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2004)), and plaintiffs now appeal.

## II. Analysis

### A. Standard of Review

This court reviews a trial court's dismissal based upon section 2-615 de novo. Kopka v. Kamensky & Rubenstein, 354 Ill. App. 3d 930, 933 (2004). "A section 2-615 motion attacks the legal sufficiency of a complaint, and this court's inquiry is limited to whether the allegations of the complaint, when viewed in the light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted." Kopka, 354 Ill. App. 3d at 933. "In order to

withstand a motion to dismiss based on section 2-615, a complaint must allege facts sufficiently setting forth the essential elements of the cause of action." Kopka, 354 Ill. App. 3d at 933. "This court must accept as true all well-pled factual allegations contained in the complaint and construe all reasonable inferences therefrom in favor of the plaintiff. [Citation.] However, a plaintiff cannot rely simply on conclusions of law or fact unsupported by specific factual allegations." Kopka, 354 Ill. App. 3d at 933-34.

---

B. Underlying Precepts and the Delaware Business Judgment Rule

The principal issues raised on appeal involve the application of the duty of loyalty and duty of care standard of the business judgment rule. These issues will be determined by application of the substantive law of Delaware, since Bank One is incorporated in that state. Spillyards v. Abboud, 278 Ill. App. 3d 663, 667 (1996).

The fiduciary duties owed by directors of a Delaware corporation are the duties of due care and loyalty. In re The Walt Disney Co. Derivative Litigation, 907 A.2d 693, 745 (Del. 2005). Delaware law is clear that the business and affairs of a corporation are managed by or under the direction of the board of directors. In re The Walt Disney Co., 907 A.2d at 746. The business judgment rule serves to protect and promote the role of the board as the ultimate manager of the corporation. In re The Walt Disney Co., 907 A.2d at 746. Because courts are ill equipped to engage in post hoc substantive review of business decisions, the business judgment rule "Operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation." In re The Walt Disney Co., 907 A.2d at 746, quoting Cede & Co. v. Technicolor, Inc., 634 A.2d 345, 360 (Del. 1993) (Cede III) .

The business judgment rule creates a "presumption that in making a business decision, the directors of a corporation acted on an informed basis, ... and in the honest belief that the action taken was in the best interests of the company [and its shareholders.]" In re The Walt Disney Co., 907 A.2d at 747, quoting Aronson v. Lewis, 473 A.2d 805, 812 (Del. 1984). This presumption applies when there is no evidence of fraud, bad faith, or self-dealing in the usual sense of personal profit or betterment on the part of the directors. In the absence of this evidence, the board's decision will be upheld unless it cannot be attributed to any rational business purpose. In re The Walt Disney Co., 907 A.2d at 747. When a plaintiff fails to rebut the presumption of the business judgment rule, he or she is not entitled to any remedy, be it legal or equitable, unless the transaction constitutes waste. In re The Walt Disney Co., 907 A.2d at 747.

This presumption can be rebutted by a showing that the board violated one of its fiduciary duties in connection with the challenged transaction. Cede III, 634 A.2d at 361. If the business judgment rule is rebutted, the burden shifts to the director defendants to demonstrate that the challenged transaction was "entirely fair" to the corporation and the plaintiff shareholders. Cede III, 634 A.2d at 361. Under the entire fairness standard of judicial review, the defendant directors must establish that the transaction was the product of fair dealing and fair price. Cede III, 634 A. 2d at 361. In addition, in the review of a transaction involving a sale of a company, the directors have the burden of establishing that the price offered was the highest value reasonably available under the circumstances. Cede III, 634 A.2d at 361, citing Revlon, Inc. v. MacAndrews & Forbes Holdings, Inc., 506 A.2d 173 (Del. 1986).

### C. Director Duty of Loyalty

Plaintiffs first contend that the circuit court erred in dismissing their second amended complaint where the business judgment rule was rebutted by plaintiffs' allegations that Dimon engaged in self-dealing during merger negotiations when he offered no premium for shareholders in exchange for his immediately becoming CEO of the newly formed entity. Plaintiffs argue that following J.P. Morgan's rejection of Dimon's no-premium offer, Dimon agreed to the low 14% premium only because it would allow him to act as president and COO of the new company for two years, followed by his promotion to CEO.

The Delaware Supreme Court has defined the duty of loyalty of officers and directors to their corporation and its shareholders in broad and unyielding terms:

> "'Corporate officers and directors are not permitted to use their position of trust and confidence to further their private interests, ...A public policy, existing through the years, and derived from a profound knowledge of human charac- teristics and motives, has established a rule that demands of a corporate officer or director, peremptorily and inexorably, the most scrupulous observance of his duty, not only affirmatively to protect the interests of the corporation committed to his charge, but also to refrain from doing anything that would work injury to the corporation, or to deprive it of profit or advantage which his skill and ability might properly bring to it, or to enable it to make in the reasonable and lawful exercise of its powers. The rule that requires an undivided and unselfish loyalty to the corporation demands that there be no conflict between duty and self-interest.'"

11

1-05-3849

Cede III, 634 A.2d at 361, quoting Guth v. Loft, Inc., 5 A.2d 503, 510

(Del. 1939).

Essentially, the duty of loyalty mandates that the best interest of the corporation and its

shareholders takes precedence over any interest possessed by a director, officer or controlling

shareholder and not shared by the stockholders generally. Cede III, 634 A.2d at 361.

The classic examples of director self-interest in a business transaction involve either a

director appearing on both sides of a transaction or a director receiving a personal benefit from a

transaction not received by the shareholders. In re The Walt Disney Co., 907 A.2d at 751.

In this case, plaintiffs have failed to allege sufficient facts to show that Dimon was self-

interested in the merger. There was no evidence that Dimon appeared on both sides of the

merger between Bank One and J.P. Morgan or that he received a personal benefit not shared by

shareholders. While plaintiffs alleged that Dimon's negotiations to retain his CEO position at the

newly formed company constituted self-dealing, Delaware law has routinely rejected the notion

that a director's interest in maintaining his office is a debilitating factor. See Benihana of Tokyo,

Inc. v. Benihana, Inc., 891 A.2d 150, 175 (Del. 2005). In addition, the record shows that the

terms of the merger agreement were disclosed in the joint proxy statement. The merger

agreement, which was approved by the Board and shareholders, disclosed the pay pledge that

Dimon was to receive and his succession to become CEO.

Plaintiffs cite HMG/Courtland Properties, Inc. v. Gray, 749 A.2d 94, 113-14 (Del. 1999),

in support of their argument that "proof of [Dimon's] *undisclosed self-dealing*, in itself, is

sufficient to rebut the * * * business judgment rule and invoke entire fairness review." In

12

HMG/Courtland Properties, Inc., the Delaware court determined that one of the directors of an incorporated real estate investment trust engaged in self-dealing where the director had a buy-side interest in the sale of corporate property where he was also a partner in one of the investors. HMG/Courtland Properties, Inc., 749 A. 2d at 113-14. Unlike HMG/Courtland Properties, Inc., there are no allegations in this case that Dimon was on both sides of the merger. Accordingly, we find plaintiffs' reliance on that case unconvincing.

### D. Board's Duty of Care

Plaintiffs next contend that the circuit court erred by dismissing their second amended complaint, where they alleged sufficient facts to show that the Board breached its duty of care and, therefore, rebutted the business judgment rule. Plaintiffs argue that the Board breached its duty of care where the merger decision was uninformed and the Board's actions were grossly negligent where the merger agreement was unfair on its face. Plaintiffs also argue that the Board failed to consider or seek out offers from banks other than J.P. Morgan.

The fiduciary duty of due care requires that directors of a Delaware corporation "'use that amount of care which ordinarily careful and prudent men would use in similar circumstances,'" and "'consider all material information reasonably available'" in making business decisions. In re The Walt Disney Co., 907 A.2d at 749, quoting Graham v. Allis-Chalmers Manufacturing Co., 188 A.2d 125, 130 (1963). Any deficiencies in the directors' process are actionable only if the directors' actions are grossly negligent. In re The Walt Disney Co., 907 A.2d at 749.

In applying the business judgment rule, a court will not find a board to have breached its

duty of care unless the directors individually and the board collectively have failed to inform themselves fully and in a deliberate manner before voting as a board upon a transaction as significant as a proposed merger or sale of the company. Cede III, 634 A.2d at 368. Only on such a judicial finding will a board lose the protection of the business judgment rule under the duty of care element and will a trial court be required to scrutinize the challenged transaction under an entire fairness standard of review. Cede III, 634 A.2d at 368.

Plaintiffs first argue that the Board breached its duty of care where it failed to inform itself of "Dimon's secret no-premium offer." Plaintiffs argue that the alleged no-premium offer shows that the ultimate 14% premium obtained had no relationship to the actual value of Bank One, but was simply the premium price Dimon was able to negotiate as the price of "delaying his takeover" as CEO of the newly formed company. Plaintiffs base this argument on the June 27, 2004, New York Times article, which reported that during negotiations with Harrison, Dimon "offered to do the deal for no premium if he could become chief executive immediately, according to two people close to the deal."[1] However, nothing in the article or plaintiffs'

---

[1] The Delaware chancery court dismissed a similar breach of fiduciary claim brought by J.P. Morgan shareholders based on the same New York Times article. See In re J.P. Morgan Chase & Co. Shareholder Litigation, 906 A.2d 808 (Del. 2005). In that case, J.P. Morgan shareholders brought a breach of fiduciary duty claim against J.P. Morgan's board of directors, alleging that the corporation paid an unnecessary premium to Bank One because it turned down Dimon's offer of a no-premium deal contingent upon Dimon immediately becoming CEO of merged corporation. The chancery court held that the fiduciary duty claim was derivative rather

14

allegations shows that the members of the Board were unaware of Dimon's negotiations with Harrison. In addition, even if the Board members were unaware of Dimon's alleged no-premium offer, the Board did not approve a no-premium condition as part of the merger agreement and the duty of the Board to inform itself before making business decisions does not require that the Board be intimately familiar with every proposal and fact during the negotiating process. See Brehm v. Eisner, 746 A. 2d 244, 259 (Del. 2000) ("the standard for judging the informational component of the directors' decisionmaking does not mean that the Board must be informed of *every* fact"); see also In re The Walt Disney Co., 907 A.2d 693 (members of the compensation committee were sufficiently informed where they were presented with key terms of the agreement to be approved, but were not privy to all aspects of underlying negotiations). Rather, an examination of the Board's duty of care focuses on the Board's decisionmaking progress and whether the Board has acted in a "deliberate and knowledgeable way in identifying and exploring alternatives." Citron v. Fairchild Camera & Instrument Corp., 569 A.2d 53, 66 (Del. 1989).

In this case, there is ample evidence to show that the Board engaged in a process to consider all material information reasonably available before voting on the merger agreement.

than a direct claim; that demand upon the corporation's board to pursue the derivative claim owned by the corporation was not excused; and that the shareholders were not individually damaged by J.P. Morgan's failure to disclose the alleged no-premium offer of merger made by Dimon, as required for their breach of duty to disclose claim. The Supreme Court of Delaware affirmed the chancery court's determination. In re J.P. Morgan Chase & Co. Shareholders Litigation, 906 A.2d 766 (2006).

1-05-3849

The joint proxy statement indicates that Bank One directors discussed the proposed merger in numerous Board meetings, that Board members were briefed and updated on merger discussions by Dimon, and that the Board authorized Dimon to continue negotiations relating to the merger. The joint proxy statement indicates that the Board considered a formal opinion from Lazard; that the proposed merger provided a fair exchange ratio to holders of Bank One common stock; and that the arrangements provided for Dimon to serve as president and COO after the merger, then succeed Harrison as CEO on the second anniversary of the completion of the merger.  The joint proxy statement also shows that the Board considered, inter alia, the following:

"[I]ts understanding of Bank One's businesses, operations, financial condition, earnings and prospects (including the report of Bank One management of the results of Bank One's due diligence review of J.P. Morgan Chase);

[I]ts understanding of the current and prospective economy and market and industry environment in which Bank One and J.P. Morgan Chase operate ***;

[T]he reports of Bank One management and the financial presentation by Lazard to Bank One's board of directors concerning the business, operations, financial condition, earnings and prospects of J.P. Morgan Chase and the expected financial impact of the merger on the combined company ***;

[T]he value of the exchange ratio *** relative to the current and historical trading prices of the common stock of each of Bank One and J.P. Morgan Chase and relative to the analyses prepared by Lazard of comparative valuations for J.P. Morgan Chase and Bank One; [and]

16

[T]he potential cost saving opportunities, currently estimated to be approximately $2.2 billion pre-tax annually when fully phased-in ***."

The joint proxy statement made clear that the Board considered numerous factors and received advice internally and from independent advisors as to the advisability of the merger agreement. We therefore find that plaintiffs did not allege sufficient facts to show that the Board was uninformed regarding the merger decision.

Plaintiffs, nonetheless, argue that the Board was grossly negligent in approving the 14% premium where it could have negotiated an exchange ratio that was more favorable to Bank One shareholders. Plaintiffs argue that the performance of the merged company's stock demonstrates that the Board breached its duty of care by approving the 14% premium because during most of the time following the merger, the stock decreased and resulted in little or no actual premium for Bank One shareholders. However, plaintiffs do not cite case law to support their argument that poor stock performance of a merged company can demonstrate a Board's breach of duty of care. Rather, the business judgment rule "'Operates to preclude a court from imposing itself unreasonably on the business and affairs of a corporation'" precisely because "courts are ill equipped to engage in post hoc substantive review of business decisions." In re The Walt Disney Co., 907 A.2d at 746, quoting Cede III, 634 A.2d at 360. Plaintiffs' allegations regarding the postmerger stock performance do not relate to whether the Board was sufficiently informed at the time it approved the merger agreement. Accordingly, we find that plaintiffs have failed to raise an issue as to whether the Board exercised due care in approving the merger agreement.

E.  Board's Fiduciary Duty Under the Unocal/Omnicare Analysis

Plaintiffs lastly contend that the termination fee provisions in the merger agreement were coercive and unwarranted protective measures that demonstrate that the Board breached its duty of care pursuant to the Supreme Court of Delaware's determinations in Unocal Corporation v. Mesa Petroleum Co., 493 A.2d 946 (Del. 1985), and Omnicare, Inc. v. NCS Healthcare, Inc., 818 A.2d 914 (Del. 2003) .

In Unocal, the Supreme Court of Delaware reaffirmed the application of the business judgment rule in the context of a hostile battle for control of a Delaware corporation where board action is taken to the exclusion of, or in limitation upon, a valid stockholder vote.  Unocal, 493 A. 2d at 954.  Unocal recognized that directors are often faced with an "inherent conflict of interest" during contests for corporate control "[b]ecause of the omnipresent specter that a board may be acting primarily in its own interests, rather than those of the corporation and its shareholders."  Unocal, 493 A.2d at 954.  Unocal thus requires a reviewing court to apply an enhanced standard of review to determine whether the directors "had reasonable grounds for believing that a danger to corporate policy and effectiveness existed" and that the board's response was "reasonable in relation to the threat posed."  Unocal, 493 A.2d at 955.  If the board action meets the Unocal standard, it is accorded the protection of the business judgment rule. Unocal, 493 A. 2d at 955.

The scrutiny of Unocal has not been limited to the adoption of a defensive measure during a hostile contest for control.  In Moran v. Household International, Inc., 500 A.2d 1346, 1350-53 (Del. 1985), the Supreme Court of Delaware held that Unocal also applied to a

18

preemptive defensive measure where the corporation was not under immediate "attack." Subsequent cases have also affirmed the application of Unocal when a board takes defensive measures in reaction to a perceived "threat to corporate policy and effectiveness which touches upon issues of control." Gilbert v. El Paso Co., 575 A.2d 1131, 1144 (Del. 1990); see also Paramount Communications, Inc. v. Time, Inc., 571 A.2d 1140 (Del. 1990).

In Omnicare, 818 A.2d at 935, a majority of the Delaware Supreme Court applied the two-stage analysis of Unocal in the context of deal-protection devices set in place to protect a proposed merger.[2] The first stage of the Unocal analysis requires a board to demonstrate "'that they [have] reasonable grounds for believing that a danger to corporate policy and effectiveness existed'" without such measures. Omnicare, 818 A.2d at 935, quoting Unocal, 493 A.2d at 955. The second stage of Unocal proceeds in two steps: the board must establish that the deal-protection devices are (1) not coercive or preclusive and (2) within a range of reasonable responses to the danger to corporate policy and effectiveness. The analysis is disjunctive- if the deal-protection devices are coercive or preclusive, they are not within a range of reasonable responses, but those devices may be outside the range of reasonable responses even if not coercive or preclusive. Omnicare, 818 A.2d at 935, citing Unocal, 493 A.2d at 955.

In Omnicare, the board of directors of NCS Healthcare, Inc. approved a merger with Genesis Health Ventures, Inc. The deal was "protected" with a three-part defense that included:

---

[2] The dissents in Omnicare by former Chief Justice Veasey and current Chief Justice Steele argue that Unocal should not have applied, but rather the business judgment rule. Omnicare, 818 A.2d at 943, 947 (Veasey, C.J., and Steele, J., dissenting).

(1) the inclusion of a "section 251(c) provision" in the merger agreement;[3] (2) the absence of any effective fiduciary out clause; and (3) a voting agreement between two shareholders and Genesis which ensured that a majority of shareholders voted in favor of the transaction. After the merger was approved by the board, a superior proposal was presented by Omnicare, Inc. The NCS board then reversed course and recommended that NCS shareholders vote against the Genesis merger. The NCS board's change of course had no practical effect because the three deal-protection mechanisms guaranteed that the transaction proposed by Genesis would obtain NCS stockholder's approval. Omnicare, 818 A.2d at 918.

In Omnicare, a majority of the Supreme Court of Delaware found that the NCS board's reasonable grounds for believing there was a danger to corporate policy and effectiveness were the possibility of losing the Genesis offer and being left with no comparable alternative transaction. Omnicare, 818 A.2d at 935. Nevertheless, the majority held that the deal-protection devices were coercive and preclusive because they accomplished a fait accompli, where they made it "mathematically impossible" and "realistically unattainable" for any other proposal to succeed, no matter how superior the proposal. Omnicare, 818 A.2d at 936. The Unocal inquiry ended there, but the Omnicare majority held "alternatively" that the NCS board was required to negotiate a fiduciary out clause into the merger agreement because the voting agreement and the "section 251(c) provision," in the absence of a fiduciary out clause, resulted in an absolute lockup

_____

[3] Such provision requires that a merger agreement be placed before a corporation's stockholders for a vote, even if the corporation's board of directors no longer recommends it. 8 Del. C. §251(c).

of the Genesis transaction. The court reasoned that even though a majority of shareholders, under the voting agreement, had agreed to support the merger, the NCS board was continually obligated to "exercise its continuing fiduciary responsibilities to the minority stockholders." Omnicare, 818 A.2d at 939.

Plaintiffs' argument that the termination fees were coercive and that Omnicare applies in this case is misplaced. Even assuming that the Unocal standard applies, the Board retained a "fiduciary out," where it could have considered any superior proposals that were presented and recommend against the merger with J.P. Morgan. In addition, the termination fees were reciprocal and the shareholders in this case could have rejected the merger proposal on its merits. Unlike Omnicare, there was no agreement among shareholders and nothing in the merger agreement made it "mathematically certain" that the transaction would be approved. If the Bank One shareholders in this case believed that the 14% premium for their shares was insufficient, they could have voted against the merger. While the merger agreement provided that if the shareholders failed to approve the merger, Bank One would owe J.P. Morgan one-third of the termination fee, the remaining two-thirds of the termination fee would only become due if Bank One entered into an agreement or completed an acquisition within 18 months of the termination of the merger agreement. Although it is possible that paying one-third of the termination fee might have influenced the Bank One shareholders' vote, the fee did not impermissibly coerce the shareholders in the exercise of their voting rights.

In addition, the termination fee provisions were similar to those found permissible by the Delaware Supreme Court in Brazen v. Bell Atlantic Corp., 695 A.2d 43 (Del. 1997). In Brazen,

the court applied the test for stockholder coercion that it had enunciated in Williams v. Geier, 671 A.2d 1368 (Del. 1996). A stockholder vote may be nullified by wrongful coercion "'where the board or some other party takes actions which have the effect of causing the stockholders to vote in favor of the proposed transaction for some reason other than the merits of that transaction.'" Brazen, 695 A.2d at 50, quoting Williams, 671 A.2d at 1382-83. The court also concluded that "'the determination of whether a particular stockholder vote has been robbed of its effectiveness by impermissible coercion depends on the facts of the case.'" Brazen, 695 A.2d at 50, quoting Williams, 671 A.2d at 1383.

In Brazen, the court upheld the validity of reciprocal termination fee provisions under which either corporation involved in a merger agreement could conceivably pay the other up to $550 million if the merger was terminated. The court determined that the termination penalty amount was small in relation to size of corporation (2% of corporation's market capitalization); the termination fees were clearly disclosed to shareholders; and there was no showing that the shareholders' vote was based on anything other than merits of transaction. The court held that the fact that stockholders knew that voting to disapprove the merger may result in activation of the termination fee does not by itself constitute stockholder coercion; and that no authority existed to support the plaintiff's proposition that a fee is coercive because it can be triggered upon stockholder disapproval of the merger agreement, but not upon the occurrence of other events resulting in termination of the agreement. The court also found that the deal protection mechanisms were reasonable where they were "an integral part of the merits of the transaction." Brazen, 695 A.2d at 50. The court concluded that "although the termination fee provision may

1-05-3849

have influenced the stockholder vote, there were 'no structurally or situationally coercive factors' that made an otherwise valid fee provision impermissibly coercive" under the facts presented. Brazen, 695 A. 2d at 50, quoting Brazen v. Bell Atlantic Corp., Del. Ch., C.A. No. 14976, slip op. at 14 (March 19, 1997).

Similarly, the fact that Bank One shareholders knew that voting to disapprove the merger would result in activating a portion of the termination fees does not constitute coercion in this case. The termination fees were clearly disclosed to shareholders and the reciprocal termination fees, drafted to protect both Bank One and J.P. Morgan in the event that the merger was not consummated, appear to have been "an integral part of the transaction." Further, nothing in the present record suggests that the termination fee provisions had the effect of causing Bank One shareholders to vote in favor of the proposed merger based on anything other than the merits. Accordingly, we find that the termination fee provisions were not impermissibly coercive and the argument that Omnicare applies in this case is misplaced.

### III. Conclusion

For the above stated reasons, we affirm the determination of the circuit court of Cook County.

Affirmed.

CAMPBELL and MURPHY, JJ.,, concur.

23